599 A.2d 848

**Ricky R. WILLIAMS**

v.

**STATE of Maryland.**

**No. 326, Sept. Term, 1991.**

Court of Special Appeals of Maryland.

Dec. 30, 1991.

Thomas C. Hill (Lori V. Gagne and Shaw, Pittmen, Potts & Trowbridge, on the brief), Washington, D.C. (Jeffrey Horn, New York City, of counsel), for appellant.

David P. Kennedy, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, and Davis R. Ruark, State's Atty. for Wicomico County, Salisbury, on the brief), for appellee.

Argued before ALPERT, ROSALYN B. BELL and DAVIS, JJ.

ALPERT, Judge.

In this appeal, we are asked to consider whether Maryland's drug kingpin statute is unconstitutionally vague and overbroad, and whether the evidence used to convict the appellant was insufficient as a matter of law. For reasons that we will elaborate herein, we conclude that the statute is neither unconstitutionally vague nor overbroad, and that the evidence was sufficient to warrant submitting the case to the jury. Consequently, we deny the appellant's request to reverse his conviction under the drug kingpin statute.

## FACTS

Ricky Ricardo Williams (Ricky), the appellant, was indicted in a ten-count indictment that charged him, inter alia, with two counts of violating Maryland's drug kingpin statute. *See* Md.Ann.Code art. 27, § 286 (Supp.1991).[1] His arrest culminated a series of events that began in late February, 1990, when the Maryland State Police (the police) launched an undercover narcotics operation targeted at Gary Williams (Gary), the appellant's brother, whom they identified as the head of a Salisbury, Maryland drug distribution network.

The operation began as a "sting" to uncover illegal fencing activities. The police set up a fictitious pawnshop and

---

**1.** The other counts were: two counts of conspiracy, one count of maintaining a common nuisance, one count of unlawful transportation of cocaine into the State of Maryland; one count of distribution of cocaine; two counts of possession of cocaine; and one count of possession of drug paraphernalia. *See* Md.Ann.Code art. 27, § 290; *id.* art. 27, § 286; *id.* art. 27, § 286A; *id.* art. 27, § 286; *id.* art. 27, § 287A (1987 & Supp.1991).

used furniture business to purchase stolen merchandise, but eventually used the storefront as part of their expanded investigations into narcotics trafficking. The police equipped the store with a video camera, and one officer posed as a drug dealer and financier (State Trooper Ike Jackson, hereinafter Jackson).

On February 28, 1990, Jackson arranged through a third person to meet Gary at the store. Gary identified himself as being in charge of a drug organization, and added that he employed several people, among them his "lieutenant," [2] Maurice Bomar (a.k.a. "Sincere"). Gary told Jackson that he could supply Jackson with cocaine and expressed his interest in buying from Jackson marijuana and firearms. Jackson arranged to purchase two ounces of cocaine from Gary, and they agreed that they would complete the sale by March 7.

Gary phoned Jackson on March 2 to tell Jackson that he had the cocaine. They met at the storefront where Gary gave Jackson more than two ounces of cocaine, the extra amount to show his good faith. Jackson paid Gary $2000, and told Gary that he wanted to purchase four more ounces.

Jackson and Gary again had telephone contact on March 15, at which time Gary indicated that he could supply Jackson four more ounces of cocaine of a higher quality than the two ounces he had already sold Jackson, and that it was time to plan some serious purchases. Gary told Jackson that on March 17 he would send Sincere to make the sale.

Gary telephoned Jackson from New York City on March 16 to tell him that he could sell Jackson two kilos of cocaine.

Sincere met Jackson at the storefront on March 17 and delivered to Jackson the four ounces of cocaine. Gary telephoned from New York to find out whether Sincere had arrived. He also spoke to Jackson about the marijuana that

---

**2.** A lieutenant in the drug trade is a trusted assistant, a right-hand person.

Jackson had promised him. Jackson told Gary that he would be willing to exchange guns and marijuana for cocaine; they agreed that Jackson would acquire one kilo of cocaine in exchange for ten pounds of marijuana, five guns, and $12,000. Sincere and Jackson disagreed over the price for the four ounces of cocaine. They called Gary, and Jackson negotiated a final price with him. They agreed to complete the kilogram sale by March 24.

On March 22, Gary stopped at the storefront. He and Jackson again negotiated for a large purchase, finally settling on two kilos in exchange for fifteen pounds of marijuana, five weapons, and $23,000.

The next day, Gary phoned Jackson and then proceeded to the storefront to tell Jackson that he was having trouble obtaining the cocaine. Gary asked Jackson whether he could buy a smaller quantity of marijuana and a few of the guns, but Jackson responded that he could only purchase them as part of a cocaine deal. Jackson gave Gary a marijuana sample, and Gary in turn handed this over to Sincere.

On March 30, Jackson and another officer posing as Jackson's lieutenant (Edward Toatley, hereinafter Toatley) went into Salisbury looking for Gary and Sincere. When they found Gary, he indicated that he no longer was interested in purchasing the marijuana, but still was interested in buying guns. Jackson told Gary and Sincere to come to the storefront, which they did.

Toatley testified that during negotiations, Gary told Toatley that he would "check with his brother and see when he could get us the cocaine and what the price would be...."

Gary proposed to Jackson that Sincere and Toatley travel by train to New York to meet Gary's source at Penn Station. He also suggested that Jackson send along a "mule" [3] to carry the drugs back to Maryland. Toatley would pay Gary's source, whereupon Toatley, Sincere, and

---

3. A "mule" is a person who carries drugs.

the mule would return. Jackson and Toatley rejected this proposal. Gary told Jackson that for an additional "turnpike tax" of $5000, his younger brother Ricky would bring the cocaine from New York to Salisbury. That evening, Gary left a telephone message asking Ricky to call him at the storefront. Ricky called back about half an hour later and agreed to bring the drugs to Salisbury. Toatley testified that after Gary got off the phone, he told them that "his brother wanted 34 [$34,000] if he had to bring it all the way." Jackson accepted, and for the next six or seven hours, Gary, Jackson, Sincere, and Toatley awaited Ricky's arrival.

Ricky reached the storefront some time after 1:30 a.m. on March 31. He asked for an additional $500 to pay the person who drove him down from New York, but Gary told him to drop it. Toatley gave Ricky $34,000 in cash; Ricky counted it, then took it to the car. Jackson testified that as Ricky counted the money, he commented that Jackson and Toatley could get a kilo anytime by calling him to arrange a meeting. Ricky returned to the car, hid the money, picked up the cocaine, went back inside, and handed the drugs to Gary. Jackson and Toatley, with the assistance of a SWAT team hidden in the back of the store, arrested Ricky, Sincere, Gary, and Ricky's driver.

Ricky was indicted on April 25, 1990 on the charges enumerated *supra*. On June 8, he filed a motion to dismiss the indictment's two drug kingpin counts. He also moved to dismiss counts two and ten (the second drug kingpin charge and the second conspiracy charge) on the ground that they duplicated counts nine and ten. Judge Alfred Truitt heard Ricky's motions on August 10, 1990, and concluded that the drug kingpin statute was constitutionally sufficient. He therefore denied Ricky's motion to dismiss the two kingpin counts, and denied Ricky's motion to dismiss counts two and ten as duplicative of counts one and nine.

Ricky was tried on September 24 and 25, 1990. When the State finished presenting its evidence, the trial court

(Simpson, J.) granted Ricky's motion for acquittal on counts two and ten: he found that they duplicated counts one and nine. The court denied Ricky's motion for judgment of acquittal as to count one, finding that the evidence was sufficient to warrant a jury determination as to whether Ricky was a drug kingpin within the statute's meaning. The jury convicted Ricky on all remaining counts, including the drug kingpin count.

The trial judge sentenced Ricky as a "drug kingpin" to twenty-five years incarceration without possibility of parole. The judge also ordered Ricky to pay a $10,000 fine pursuant to the same count.

Ricky now appeals his conviction, and presents the following questions for our review.

I. Is the Maryland drug kingpin statute unconstitutionally vague insofar as it fails to define what an organizer, supervisor, manager or financier of a drug conspiracy is, and is that statute unconstitutionally overbroad insofar as it encompasses by its terms conduct which the legislature could not possibly have intended to be punished by the severe mandatory penalties of the statute?

II. Was the State's evidence sufficient to support Appellant's conviction as a drug kingpin when the uncontroverted evidence established that his only involvement whatsoever in any drug conspiracy was to drive cocaine from New York to Salisbury at his kingpin brother's request on the night of Appellant's arrest?

## MARYLAND'S DRUG KINGPIN STATUTE

Maryland's Drug Kingpin statute in part provides the following.

(a) [I]t is unlawful for any person:

(1) To manufacture, distribute, or dispense, or to possess a controlled dangerous substance in sufficient quantity to reasonably indicate under all circumstances an intent to manufacture, distribute, or dispense, a controlled dangerous substance;

(f)(1) If a person violates subsection (a)(1) of this section and the violation involves any of the following controlled dangerous substances, in the amounts indicated, the person is subject to the penalties provided in paragraph (3) of this subsection upon conviction:

. . . . .

(ii) 448 grams or more of cocaine or 448 grams or more of any mixture containing a detectable amount of cocaine; . . .

(g)(1) In this subsection, "drug kingpin" means a person who occupies a position of an organizer, supervisor, financier, or manager as a coconspirator in a conspiracy to manufacture, distribute, dispense, bring into, or transport in the State controlled dangerous substances.

(2) A drug kingpin who conspires to manufacture, distribute, dispense, bring into, or transport in the State controlled dangerous substances in one or more of the amounts described under subsection (f) of this section is guilty of a felony and on conviction is subject to:

(i) Imprisonment for not less than 20 nor more than 40 years without the possibility of parole, and it is mandatory on the court to impose no less than 20 years' imprisonment, no part of which may be suspended; and

(ii) A fine of not more than $1,000,000.

Md.Ann.Code art. 27, § 286 (Supp.1991). The statute came into effect on July 1, 1989.

### 1. Whether the Statute is Unconstitutionally Vague

██ The appellant argues that the statute is unconstitutionally vague in that it does not describe how to determine whether an accused person is a drug kingpin. In particular, the words "organizer, supervisor, financier, or manager as a coconspirator in a conspiracy" are not sufficiently explicit to ensure that persons adequately understand what the legislature proscribes. The appellant urges us to compare Maryland's statute with a similar federal statute in which

the language arguably is more precise in that it refers to the kingpin as the "principal" actor. *See* 21 U.S.C. § 848(b) (1988).[4] He argues that he cannot be a kingpin if the word "principal" is implied in Maryland's statute because his role in the transaction was limited to assisting his brother Gary by bringing the cocaine from New York to Salisbury. The appellant concludes that unless the court reads this or similar language into the statute, the statute is unconstitutionally vague. We disagree.

For the sake of clarity, if not brevity, we here reproduce the federal statute:

§ 848. Continuing criminal enterprise

(a) Penalties; forfeitures

Any person who engages in a continuing criminal enterprise shall be sentenced to a term of imprisonment which may not be less than 20 years and which may be up to life imprisonment, to a fine not to exceed the greater of that authorized in accordance with the provisions of title 18 or $2,000,000 if the defendant is an individual or $5,000,000 if the defendant is other than an individual, and to the forfeiture prescribed in ... this title; except that if any person engages in such activity after one or more prior convictions of him under this section have become final, he shall be sentenced to a term of imprisonment which may not be less than 30 years and which may be up to life imprisonment, to a fine not to exceed the greater of twice the amount authorized in accordance with the provisions of title 18 or $4,000,000 if the defendant is an individual

---

4. In *Allen v. State,* 89 Md.App. 25, 51, 597 A.2d 489 (1991), Judge Diana G. Motz said for the court: "Given the relative newness of the Maryland statute, coupled with its similarity both in purpose and in language to the federal law, the precedent emerging from federal courts regarding drug kingpins may be instructive with respect to interpretation of the Maryland law." We observed that federal case law requires that more than a buyer-seller arrangement exist in order to recognize a party as a drug kingpin, but did not decide whether federal principles applied equally to the Maryland statute.

or $10,000,000 if the defendant is other than an individual, and to the forfeiture prescribed [elsewhere] in this title.

(b) Life imprisonment for engaging in continuing criminal enterprise

Any person who engages in a continuing criminal enterprise shall be imprisoned for life and fined in accordance with subsection (a) ... if—

(1) such person is the principal administrator, organizer, or leader of the enterprise or is one of several such principal administrators, organizers, or leaders; and

(2)(A) the violation ... involved at least 300 times the quantity of a substance described in ... this title, or

(B) the enterprise, or any other enterprise in which the defendant was the principal or one of several principal administrators, organizers, or leaders, received $10 million dollars in gross receipts during any twelve-month period of its existence for the manufacture, importation, or distribution of a substance described in ... this title.

(c) "Continuing criminal enterprise" defined

For purposes of subsection (a) of this section, a person is engaged in a continuing criminal enterprise if—

(1) he violates any provision of this chapter ... the punishment for which is a felony, and

(2) such violation is a part of a continuing series of violations of this subchapter—

(A) which are undertaken by such person in concert with five or more other persons with respect to whom such person occupies a position of organizer, a supervisory position, or any other position of management, and

(B) from which such person obtains substantial income or resources.

(d) Suspension of sentence and probation prohibited

In the case of any sentence imposed under this section, imposition or execution of such sentence shall not be suspended, probation shall not be granted....

. . . . .

21 U.S.C. § 848 (1988).

Although the federal statute in some ways resembles the one at issue here, the appellant's argument that we should look for guidance to its language and the case law interpreting it is misguided. The federal and state statutes' use of different terms does not render the state statute vague. *See Brooks v. State*, 41 Md.App. 123, 127, 395 A.2d 1224 (1979) ("absence of definitional specificity ... is not necessarily an unconstitutional infirmity mandating invalidation of a statute.").

In support of his argument, the appellant relies on the case *United States v. Torres*, in which a federal court considered an attack upon the federal statute based upon the argument that it was unconstitutionally vague. *Torres*, 683 F.Supp. 56 (S.D.N.Y.1988), *rev'd in part on other grounds*, 901 F.2d 205 (2d Cir.1990) (*Torres II*). In *Torres*, the defendants argued that the federal statute was unconstitutionally vague because it did not define the terms used therein. *Id.* at 59.

The *Torres* court rejected this argument, finding the statute sufficiently clear to weather the vagueness challenge. Appellant argues that in reaching this decision, however, the court accorded considerable weight to the statute's use of the word "principal," [5] and urges this court to imply similar meaning into Maryland's statute. But as the State points out, the *Torres* vagueness challenge involved a particular subsection of the federal statute apply-

---

5. "Through the use of the word 'principal,' Congress sufficiently indicated at whom the statute was targeted, and it is not the responsibility of this Court to draft more precise language.... The discretion of law enforcement officials in prosecuting individuals under § 848(b) is successfully limited by the use of the word 'principal.'" *Torres*, 683 F.Supp. at 59.

ing to "super kingpins." *Torres II,* 901 F.2d at 224; *see* 21 U.S.C. § 848(b) (enhanced sentencing applies if the defendant is a principal administrator, organizer, or leader, and if large quantities are involved, and the association transacts a large dollar volume of business). We concur with the State's argument that the *Torres* court "merely noted that by the addition of the word 'principal' Congress made it clear which drug kingpins were liable to the *mandatory life* sentence, as opposed to the ordinary mandatory sentence for lesser ... kingpins, so as to refute the argument that [the particular subsection] was no different than [any other]."

The federal statute survived a similar vagueness challenge in *United States v. Valenzuela,* in which the court found sufficiently clear the words "organizer, a supervisory position, or any other position of management." *Valenzuela,* 596 F.2d 1361 (9th Cir.1979), *cert. denied* 444 U.S. 865, 100 S.Ct. 136, 62 L.Ed.2d 88 (1979). The court commented that

> the words encompassed within the phrase "organizer, a supervisory position, or any other position of management" enjoy a wide currency in the business community and are commonly understood by members of the general public. In enacting § 848, Congress was clearly concerned with large-scale profit-making enterprises engaged in the illegal importation manufacture and distribution of controlled substances. The language under consideration was clearly chosen to distinguish minor enterprise 'employees' from those who conceive and coordinate enterprise activities.

*Id.* at 1367–68; *see id.* at 1366 (collecting cases from the second, fifth, sixth and eighth circuits upholding the section's constitutionality in the face of attacks for vagueness).

No doubt a criminal statute must give persons notice that their conduct is unlawful. *See Eanes v. State,* 318 Md. 436, 458–59, 569 A.2d 604, *cert. denied,* —— U.S. ——, 110 S.Ct. 3218, 110 L.Ed.2d 665 (1990) (statute must be "sufficiently explicit to inform those who are subject to it what conduct

on their part will render them liable to its penalties.")
(*quoting Bowers v. State,* 283 Md. 115, 120, 389 A.2d 341
(1978)). In determining whether a statute is vague, a court
must examine whether its words "can be fairly ascertained
by reference to judicial determinations, the common law,
dictionaries, treatises or even the words themselves, if they
possess a common and generally accepted meaning." *Bow-
ers,* 283 Md. at 125, 389 A.2d 341. The *Bowers* court
qualified its comments by stating that mathematical certain-
ty is not required, and that the legislature need not describe
the prohibited conduct in elaborate detail. *Id.* at 129, 389
A.2d 341.

In a very recent case involving a vagueness attack on a
different subsection of Article 27, section 286, Judge Rosa-
lyn B. Bell opined for this court: "The touchstone in deter-
mining whether a statute is impermissibly vague is whether
'persons of common intelligence need reasonably guess at
its meaning.'" *Anderson v. State,* 89 Md.App. 712, 599
A.2d 861 (Md.Ct.Spec.App. No. 483, September Term, 1991,
filed: 12/30/91) Slip. Op. at 3 (quoting *Broadrick v. Okla-
homa,* 413 U.S. 601, 607, 93 S.Ct. 2908, 2913, 37 L.Ed.2d 830
(1973).

Maryland's statute is not unconstitutionally vague: its
terms are common ones, their meanings easily ascertained
and understood. For example, a manager is

"one that manages: a person that conducts, directs, or
supervises something: as ... c: a person whose work or
profession is the management of a specified thing (as a
business, an institution, or a particular phase or activity)
within a business or institution."

Webster's Third New International Dictionary 1372 (1981).
The appellant cannot reasonably argue that he was insuffi-
ciently notified that his conduct was illegal as proscribed by
the statute,[6] nor can he argue that the statute's language

---

**6.** We repeat here the federal district court's comments in *Torres:* "a
party that engages in conduct with criminal intent should not be

provides so little guidance that the law is likely to be enforced discriminatorily.

## 2. Whether the Statute is Overbroad

The appellant also argues that Maryland's drug kingpin statute is overbroad and therefore unconstitutional. He contends, for example, that the legislature could not have intended the statute's mandatory and harsh results to apply to a courier whose only action in organizing or initiating a conspiracy is to ask a friend to accompany him on the journey to deliver the drugs.[7]

 We note that the overbreadth doctrine applies to invalidate statutes capable of being used to punish constitutionally protected speech or conduct. *See Thornhill v. Alabama,* 310 U.S. 88, 97, 60 S.Ct. 736, 741, 84 L.Ed. 1093 (1940). As this doctrine is inapplicable in the case *sub judice* we assume that the appellant's argument is that the statute is invalid because it reaches further than the legislature intended.

This argument is unpersuasive in light of the legislature's intent to establish "certain criminal penalties and procedures designed to reduce the supply of controlled dangerous substances in this State." Ch. 287, Laws of Md.1989, 2409. Indeed, the original bill's language was demonstrably narrower, but the legislature broadened the law's reach by eliminating threshold requirements that the person conspire with a minimum number of people and for a specified sum of money. *See id.* at 2416. The eliminated language included the following:

(A) In this section a person is a leader of a drug trafficking network if:

---

surprised that the proscribed behavior is subject to punishment." *Torres,* 683 F.Supp. at 59.

7. We need not address that particular issue here, because the trial court dropped the charge alleging that Ricky was a drug kingpin with respect to a conspiracy he initiated with his driver.

(1) The person conspires with 10 or more other persons to engage for profit in a scheme or course of conduct to unlawfully manufacture, distribute, dispense, bring into, or transport in this state any controlled dangerous substance, and

(2) The person occupies a position of an organizer, supervisor, financier, or manager in such scheme or course of conduct.

*Id.*

Given the legislature's goal, and its decision to eliminate the statute's narrowing language, we conclude that the statute's broad reach reflects the legislature's deliberate intent. It is not unlawfully broad.

## THE SUFFICIENCY OF THE EVIDENCE

■ The appellant also argues that his only involvement in the drug conspiracy was to transport the cocaine from New York to Salisbury, and that as a matter of law, this was not enough to warrant his conviction under the drug kingpin statute. He argues that the judge should not have allowed the jury to consider the drug kingpin charge.

The appellant cites the following evidence to support his argument that his participation in the events leading to his arrest and conviction did not fall within the statute's ambit: he was not involved in the conspiracy until a month after it began; his brother Gary was the kingpin, and was the correct target of the police investigation; his participation was limited to his role as courier.

The test for reviewing the sufficiency of the evidence to support a criminal conviction is "whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." *Tichnell v. State*, 287 Md. 695, 717, 415 A.2d 830 (1980) (*quoting Jackson v. Virginia*, 443 U.S. 307, 318, 99 S.Ct. 2781, 2788, 61 L.Ed.2d 560 (1979)). The court continued, stating that "the standard to apply is 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the

essential elements of the crime beyond a reasonable doubt.' " *Id.*

The appellant mistakenly believes that he cannot be convicted as a kingpin if his role was subordinate to that of another actor in the conspiracy. Nothing in the law dictates that a conspiracy can have only one kingpin. Indeed, the statute's language encompasses the possibility of a joint endeavor: among the definition section's meanings is a "manager as a *coconspirator.*" Md.Ann.Code art. 27, § 286(g)(1) (Supp.1991) (emphasis supplied). ·

The evidence amply supports the idea that Ricky acted in concert with Gary as a coconspirator. Jackson and Toatley gave the purchase money directly to Ricky; Ricky counted it; Ricky told Jackson and Toatley that they could deal directly with him; Ricky took the money and hid it in the car in which he transported the drugs. Gary's assertions also support the conclusion that Ricky was his coconspirator and an important participant in the conspiracy: Ricky set the sale price; Gary told Jackson and Toatley that he (Gary) was the intermediary in arranging an exchange between them and Ricky, and that he did not control the deal. Moreover, as an expert witness in narcotics enforcement, Jackson testified that mules have no control over the drugs they carry, and are paid $500 to transport drugs from New York. Because Ricky had complete dominion and control over the $34,000 paid to him for the drugs, Jackson concluded that Ricky was not merely a mule. Jackson also testified that Gary told him that Gary wasn't profiting from this transaction: "[h]e just made the arrangements for me to purchase the kilo of cocaine from or through his brother."

In sum, the evidence readily supports the theory that Ricky managed or supervised an illicit drug operation. This operation could have been orchestrated by Gary's organization and limited to arranging to bring the cocaine from New York to Maryland. Alternatively, it could be inferred that Ricky was Gary's New York connection, prepared to assist in the transfer Gary initially proposed to Jackson in which Toatley and Sincere would travel to New York to pick up

the drugs. In either case, the jury reasonably could conclude that Ricky was responsible for an important and necessary phase of the operation: moving the cocaine from New York and delivering it to its Maryland purchaser. We therefore affirm Ricky's conviction under the drug kingpin statute.

JUDGMENTS AFFIRMED; APPELLANT TO PAY THE COSTS.