616 A.2d 1275

**Ricky R. WILLIAMS**

v.

**STATE of Maryland.**

**No. 7, Sept. Term, 1992.**

Court of Appeals of Maryland.

Dec. 23, 1992.

2

Thomas C. Hill (Shaw, Pittman, Potts and Trowbridge, and Lori V. Gagne, on brief), Washington, D.C., for petitioner.

David P. Kennedy, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on brief), Baltimore, for respondent.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, McAULIFFE, CHASANOW, KARWACKI, and ROBERT M. BELL, JJ.

MURPHY, Chief Judge.

This case involves Maryland's "Drug Kingpin Act" enacted by ch. 287 of the Acts of 1989, now codified within the provisions of Maryland Code (1992 Repl.Vol.), Art. 27, § 286. Section 286(a)(1) makes it unlawful for any person "[t]o manufacture, distribute, or dispense, or to possess a controlled dangerous substance in sufficient quantity to reasonably indicate under all circumstances an intent to

**4**

manufacture, distribute, or dispense, a controlled dangerous substance." Section 286(g)(2) provides that if any person violates § 286(a)(1), the violation involves *inter alia* "448 grams or more of cocaine," and the person is a "drug kingpin," that individual is subject to the penalties set forth in § 286(g). That section defines a "drug kingpin" as a person

> "who occupies a position of an organizer, supervisor, financier, or manager as a coconspirator in a conspiracy to manufacture, distribute, dispense, bring into, or transport in the State controlled dangerous substances."

Section 286(g)(2) provides that "[a] drug kingpin who conspires to manufacture, distribute, dispense, bring into, or transport in the State controlled dangerous substances" in amounts proscribed by § 286(f)(1) is guilty of a felony and on conviction is subject to:

> "(i) Imprisonment for not less than 20 nor more than 40 years without the possibility of parole, and it is mandatory on the court to impose no less than 20 years' imprisonment, no part of which may be suspended; and
> (ii) A fine of not more than $1,000,000."

I.

In late February 1990, the Maryland State Police launched an undercover narcotics investigation in Salisbury. It targeted the activities of one Gary Williams (Gary), the suspected head of a drug distribution network in Salisbury, who was the older brother of petitioner Ricky Williams (Ricky). In the conduct of its investigation, the police operated from a fictitious pawnshop storefront known as "Big Bubba's." State Trooper Ike Jackson (Jackson) posed as a drug dealer and purchaser at Big Bubba's; the shop was equipped with video surveillance cameras.

On February 28, 1990, by arrangement of a third party, Jackson met Gary at Big Bubba's. Gary identified himself as head of a local drug organization, named one Maurice ("Sincere") Bomar as his lieutenant, and indicated that he

employed several others. Gary told Jackson that he could supply him with cocaine, while expressing an interest in buying guns and marijuana from Jackson. Jackson offered to purchase two ounces of cocaine from Gary, and they agreed to complete the sale by March 7.

On March 2, Gary and Jackson met again at Big Bubba's. Gary produced slightly more than two ounces of cocaine "to show his good faith," for which Jackson paid $2,000. Their relationship thus established, Jackson told Gary he wanted to purchase four more ounces.

On March 15, Gary phoned Jackson to offer the four ounces that Jackson desired. He told Jackson that the cocaine was of "top shelf quality," and that on March 17 he would send Sincere to Big Bubba's to consummate the sale. Gary also suggested that it was time to plan some serious purchases, and in that vein he called Jackson the next day from New York City to say that he could sell Jackson two kilos of cocaine.

The following day, March 17, Sincere delivered the four ounces of cocaine to Jackson at Big Bubba's. Gary, phoning Jackson from New York to determine whether Sincere had arrived, again expressed interest in obtaining marijuana. Jackson reiterated his willingness to trade guns and marijuana for cocaine. Jackson and Gary tentatively agreed to yet another deal, their third, in which Jackson would receive one kilo of cocaine in exchange for ten pounds of marijuana, five guns, and $12,000. Meanwhile, Jackson and Sincere haggled over the purchase price of the four ounces and found it necessary to call Gary in New York. After Gary resolved the dispute, he and Jackson agreed to complete the third sale by March 24.

On March 22, Gary stopped at Big Bubba's to inquire whether Jackson had liked the four ounces. Jackson answered affirmatively, and they renegotiated the third sale to Jackson to encompass two kilos of cocaine in return for fifteen pounds of marijuana, five weapons, and $23,000.

On March 23, Gary explained to Jackson at Big Bubba's that he was having some difficulty obtaining the cocaine; he offered to purchase a lesser quantity of the guns and marijuana for cash. Jackson rejected this proposal, making the guns and marijuana available only as part of a sale of cocaine.

On March 30, not having heard from Gary, Jackson and Edward Toatley (Toatley), a second undercover officer posing as Jackson's lieutenant, located Gary in Salisbury, at which time Gary said that while he still wanted to buy guns, he was no longer interested in purchasing marijuana. Jackson, Toatley, and Gary then undertook to renegotiate the terms of the transaction. Gary suggested to Jackson that Toatley, Sincere, and a female drug carrier of Jackson's choice travel by train to New York, where at Penn Station the female "mule" would be outfitted with one kilo of cocaine in return for $28,000. Jackson rejected this proposal. Gary then offered that, for an additional $5,000 "turnpike tax," his younger brother Ricky would bring the "sugar" to Salisbury. Jackson accepted this offer, at which point Gary called New York and left a message for Ricky to call him back at Big Bubba's.

Ricky returned Gary's call within a half hour. After he and Gary spoke, Gary told Jackson that Ricky wanted $34,000 to bring the cocaine to Salisbury. Jackson agreed. For the next six or seven hours, Jackson, Toatley, Gary, and Sincere awaited Ricky's arrival.

Ricky entered Big Bubba's at approximately 1:37 a.m. on March 31. He asked for an additional $500 to pay Keith Walker, an individual who had driven him from New York. Ricky dropped this demand when Gary instructed him to "chill out." Toatley then handed Ricky $34,000 in cash, which Ricky counted and hid in his car. Ricky returned with the kilo of cocaine, which he handed to Gary. At that time, he told Jackson that in the future Jackson could buy cocaine directly from him. With the assistance of a SWAT team hidden in the back of the store, Jackson and Toatley then arrested Ricky, Gary, Sincere, and Walker.

On April 25, 1990 Ricky was indicted in a ten-count indictment, including two conspiracy counts and two counts of being a "drug kingpin" under the Maryland Drug Kingpin statute. On June 8, Ricky moved to dismiss the two kingpin counts on the ground that the kingpin statute was unconstitutionally vague. The motion was denied.

On August 21, the State responded to Ricky's motion for a bill of particulars, naming Gary and Ricky as the only conspirators in the conspiracy and drug kingpin counts.

■ Ricky was tried before a jury in the Circuit Court for Wicomico County on September 24 and 25, 1990. The court (Simpson, J.) granted Ricky's motion for acquittal on two of the ten counts, including the second kingpin count (the conspiracy to transport), on the ground that they were duplicative of other counts (*e.g.*, the conspiracy to distribute). The jury convicted Ricky on the other eight charges, including the remaining kingpin and conspiracy counts.[1] Consistent with the provisions of § 286(g)(2), the court sentenced Ricky to twenty-five years' imprisonment, without the possibility of parole, and ordered him to pay a $10,000 fine. The court also sentenced Ricky to a concurrent thirty-year sentence on his convictions under the remaining counts.

Ricky appealed to the Court of Special Appeals, contending only that Maryland's Drug Kingpin Act was unconstitutionally vague and, secondly, that the evidence at trial was legally insufficient to sustain his drug kingpin conviction.

---

**1.** The drug kingpin count of the indictment under which Ricky was convicted charged that from February 28 through March 31, 1990, Ricky occupied "a position of an organizer, supervisor, [and] financier" in a conspiracy with Gary Williams to distribute cocaine in the amount of 448 grams or greater. The conspiracy count of which Ricky was convicted charged that between these dates Ricky conspired with Gary Williams to distribute cocaine.

The gist of a conspiracy is an agreement between two or more persons to commit a crime. The crime is complete when the unlawful agreement is reached, and no overt act in furtherance of the agreement need be shown. *See Apostoledes v. State*, 323 Md. 456, 461–62, 593 A.2d 1117 (1991).

That court affirmed. *Williams v. State*, 89 Md.App. 685, 599 A.2d 848 (1991). We granted certiorari to consider the significant issues raised in the case.

## II.

Ricky first argues that the statute is unconstitutionally vague for failure to define who qualifies as an "organizer, supervisor, financier, or manager" in a drug conspiracy. He also posits that even if the statute is adequately clear on its face, it is vague as applied to the facts of this case because it is legally impossible under the statute for both persons in a two-person conspiracy to be drug kingpins.

As classically stated, the void-for-vagueness doctrine requires that a penal statute "be sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties." *Connally v. General Const. Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926). The vagueness doctrine, rooted in the fourteenth amendment's guarantee of procedural due process, stems from two ideas. The first is that one should not "be required at peril of life, liberty, or property to speculate as to the meaning of penal statutes. All are entitled to be informed as to what the State commands or forbids." *Lanzetta v. New Jersey*, 306 U.S. 451, 453, 59 S.Ct. 618, 619, 83 L.Ed. 888 (1939). We have said that this is the "fair notice principle, ... that persons of ordinary intelligence and experience be afforded a reasonable opportunity to know what is prohibited, so that they may govern their behavior accordingly." *Bowers v. State*, 283 Md. 115, 121, 389 A.2d 341 (1978). In determining whether a statute satisfies this principle, the touchstone is whether persons "of common intelligence must necessarily guess at [the statute's] meaning." *Broadrick v. Oklahoma*, 413 U.S. 601, 607, 93 S.Ct. 2908, 2913, 37 L.Ed.2d 830 (1973).

The second rationale for the vagueness doctrine, which the Supreme Court deems "more important," *Kolender v. Lawson*, 461 U.S. 352, 358, 103 S.Ct. 1855, 1858, 75 L.Ed.2d

903 (1983), is to ensure that criminal statutes provide "legally fixed standards and adequate guidelines for police, judicial officers, triers of fact and others whose obligation it is to enforce, apply and administer the penal laws." *Bowers, supra,* 283 Md. at 121, 389 A.2d 341. Without such standards, penal laws would "impermissibly delegate[ ] basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application." *Grayned v. City of Rockford,* 408 U.S. 104, 108–09, 92 S.Ct. 2294, 2299, 33 L.Ed.2d 222 (1972). In order to satisfy this second rationale, therefore, a statute must eschew arbitrary enforcement in addition to being intelligible to the reasonable person.

 In contending that the Maryland Drug Kingpin Act violates these principles, and is therefore unconstitutionally vague, Ricky argues that it is unclear who qualifies as an "organizer, supervisor, financier, or manager" in a drug conspiracy. He suggests that, by giving an accomplice a trivial order or by taking the slightest initiative, even the lowliest of coconspirators could be deemed a "manager," "supervisor," or "organizer" in the conspiracy and could thus qualify as a "drug kingpin." He says that the average person cannot ascertain the upper limit of one's conduct before becoming a drug kingpin, and that the statute invites law enforcement officials to wield its enhanced penalties selectively. We do not agree.

Relative to the usual vagueness challenge, Ricky's assertion is clearly without merit. The Supreme Court "has long recognized that the constitutionality of a vague statutory standard is closely related to whether that standard incorporates a requirement of *mens rea.*" *Colautti v. Franklin,* 439 U.S. 379, 395, 99 S.Ct. 675, 685, 58 L.Ed.2d 596 (1979). This is because "the requirement of a specific intent to do a prohibited act . . . relieve[s] the statute of the objection that it punishes without warning an offense of which the accused was unaware." *Screws v. United States,* 325 U.S. 91, 101–02, 65 S.Ct. 1031, 1035, 89 L.Ed. 1495 (1945) (plurality

opinion). While the Maryland Drug Kingpin Act does not expressly require a specific intent to "wilfully" or "purposefully" occupy a position as an "organizer, supervisor, financier, or manager" in a drug conspiracy, the statute does, of course, impliedly necessitate a deliberate foray into some threshold of criminal drug involvement before one can reach the brink of drug kingpin status. Thus, in the same manner as specific intent statutes, the drug kingpin statute can in no way be "a trap for those who act in good faith." *United States v. Ragen*, 314 U.S. 513, 524, 62 S.Ct. 374, 379, 86 L.Ed. 383 (1942). *See also Boyce Motor Lines v. United States*, 342 U.S. 337, 340, 72 S.Ct. 329, 331, 96 L.Ed. 367 (1952) (It is not "unfair to require that one who deliberately goes perilously close to an area of proscribed conduct shall take the risk that he may cross the line.").

Put another way, Ricky alleges that the Maryland Drug Kingpin statute is vague as to when a low-level drug dealer becomes a high-level kingpin. But vagueness as between degrees of illegality seems less objectionable than vagueness at the margin of legality, for the former cannot snare the unsuspecting. Ricky knew his drug dealings were proscribed; the statute did not force him to speculate at his peril as to the propriety of his conduct. Ricky's defense is therefore less compelling than the historical vagueness challenges of defendants for whom the very stigma of a criminal conviction hung in the balance. As the Supreme Court has said, "A mind intent upon willful evasion is inconsistent with surprised innocence." *Ragen, supra*, 314 U.S. at 524, 62 S.Ct. at 379. Ricky proceeded not uninformed of the criminality of his behavior, but merely unaware of the number of counts he might face and the number of years he might spend in prison.

In any event, we conclude that the Maryland Drug Kingpin statute is not vague. In *Bowers, supra*, 283 Md. 115, 389 A.2d 341, we upheld against a vagueness challenge a statutory definition of child abuse as "cruel or inhumane treatment." We observed that "[a] statute is not vague when the meaning of the words in controversy can be fairly

ascertained by reference to judicial determinations, the common law, dictionaries, treatises or even the words themselves, if they possess a common and generally accepted meaning." *See also Rose v. Locke*, 423 U.S. 48, 50, 96 S.Ct. 243, 244, 46 L.Ed.2d 185 (1975) ("Even trained lawyers may find it necessary to consult legal dictionaries, treatises, and judicial opinions before they may say with any certainty what some statutes may compel or forbid.").

The Maryland Drug Kingpin statute satisfies this standard at its most basic level, for the meanings of the statute's operative words can be "fairly ascertained by reference to ... the words themselves." The terms "organizer," "supervisor," "financier," and "manager" are not vague. They are not technical terms; rather, they are common words with well understood meanings. As these words are defined by Webster's Third New International Dictionary (1981), an "organizer" is "one who organizes" (to "organize" is "to unify into a coordinated functioning whole; ... to arrange by systematic planning and coordination of individual effort"). A "supervisor" is "one that supervises a person, group, department, organization, or operation" ("supervise" is "to ... oversee with the powers of direction and decision the implementation of one's own or another's intentions"). A "financier" is "a large scale investor." A "manager" is "one that manages, a person that conducts, directs, or supervises something."

Because these definitions comport with everyday understandings of the words they define, the drug kingpin statute employs language accessible to persons of common intelligence; they need not guess at the statute's meaning. The statute makes clear, in ordinary language, that those who occupy positions of importance in drug conspiracies will be subject to heightened punishment. Nor does the statute foster selective prosecution, since its terms are as plain to law enforcement officials as to the general public. The statute does not become unconstitutionally vague merely because it may not be perfectly clear at the margins who qualifies as an "organizer," "supervisor," "financier," or

"manager." *See Eanes v. State,* 318 Md. 436 at 459, 569 A.2d 604 (1990) ("A law is not vague simply because it requires conformity to an imprecise normative standard."). Rather, the drug kingpin law plainly provides fair warning of serious consequences to drug conspirators who would assume the posture of "an organizer, supervisor, financier, or manager," as those words are understood in common parlance.

Ricky argues that the statute is vague when considered against the corresponding federal drug kingpin law and those of other states. The federal statute provides in part:

"[A] person is engaged in a continuing criminal enterprise if—

(1) he violates any provision of this subchapter or subchapter II of this chapter the punishment for which is a felony, and

(2) such violation is part of a continuing series of violations of this subchapter or subchapter II of this chapter—

(A) which are undertaken by such person in concert with five or more other persons with respect to whom such person occupies a position of organizer, a supervisory position, or any other position of management, and

(B) from which such person obtains substantial income or resources."

21 U.S.C. § 848(c) (1992). Ricky points to the federal requirements that the manager, organizer, or supervisor act in concert with at least five others and derive substantial income from the enterprise as evidence of the specificity with which a statute must be drawn to pass constitutional muster. Ricky claims that the federal statute, by adding these further requirements to modify and refine the statute's operative terms, demonstrates the vagueness of Maryland's sole requirement that a person be an "organizer, supervisor, financier, or manager."

This argument mistakes breadth for vagueness. By stiffening the penalties for those who act in the management ranks of drug conspiracies, without regard to the number or income of coconspirators, the Maryland statute simply constructs a wider net than that enacted by Congress. While the breadth of the Maryland formulation necessarily forfeits some of the precision of the narrower federal statute, this does not render the Maryland law vague. Otherwise, all broad laws attempting to punish a range of criminal conduct could be susceptible to vagueness challenges insofar as they could be drawn more narrowly and precisely. As the Supreme Court said in *Colten v. Kentucky*, 407 U.S. 104, 110, 92 S.Ct. 1953, 1957, 32 L.Ed.2d 584 (1972):

> "The root of the vagueness doctrine is a rough idea of fairness. It is not a principle designed to convert into a constitutional dilemma the practical difficulties in drawing criminal statutes both general enough to take into account a variety of human conduct and sufficiently specific to provide fair warning that certain kinds of conduct are prohibited."

In other words, the vagueness doctrine does not require absolute precision or perfection. *See United States v. Powell*, 423 U.S. 87, 94, 96 S.Ct. 316, 321, 46 L.Ed.2d 228 (1975) ("The fact that Congress might, without difficulty, have chosen '[c]learer and more precise language' equally capable of achieving the end which it sought does not mean that the statute which it in fact drafted is unconstitutionally vague."). Since the Maryland Drug Kingpin Act makes its proscriptions readily discernible to both the general public and law enforcement officials, then even though it may be broad and imperfect, it is not for that reason unconstitutionally vague.

Ricky next suggests that the statute is vague, as applied to the facts in this case, because as only he and Gary were named as conspirators in the conspiracy underlying his drug kingpin conviction, it is impossible for both to be an "organizer, supervisor, financier, or manager" in the conspiracy. This is so, he argues, because both parties in a

two-person conspiracy cannot meaningfully "organize", "supervise," or "manage" each other.[2]

The flaw in Ricky's argument is that it assumes that one must be an organizer, supervisor, or manager of elements in the conspiracy in which one is charged to satisfy the drug kingpin statute. This is not the case. Under the statute, a "'drug kingpin' means a person who occupies a position of an organizer, supervisor, financier, or manager as a coconspirator in a conspiracy to ... distribute ... or transport in the State controlled dangerous substances." There is nothing in this language requiring a defendant to organize, supervise, or manage those in the central conspiracy in order to qualify as a drug kingpin.

In the instant case, even though Ricky and Gary were identified in the indictment as the sole conspirators in the central conspiracy, a jury could reasonably find, if legally sufficient evidence existed, that Ricky had organized, supervised, or managed the operation, perhaps involving others not fully apprised as to the central conspiracy and hence not central conspirators. In this manner could Ricky fall within the purview of the statute.

For all of these reasons, we find no merit in Ricky's constitutional argument. *See also Anderson v. State,* 89 Md.App. 712, 599 A.2d 861 (1991); *Allen v. State,* 89 Md.App. 25, 597 A.2d 489 (1991).

### III.

Finally, Ricky contends that even if the Maryland statute survives constitutional review, there was insufficient evidence as a matter of law to prove beyond a reasonable doubt that he served as an "organizer, supervisor, financier, or manager" in a drug conspiracy.

---

**2.** Gary Williams was also indicted for being a drug kingpin in connection with the same transactions that resulted in Ricky's conviction for the same offense. Gary was convicted at a separate trial a week following Ricky's conviction.

When assessing the sufficiency of the evidence to support a jury conviction in a criminal case, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original); *quoted in McMillian v. State,* 325 Md. 272, 290, 600 A.2d 430 (1992); *Tichnell v. State,* 287 Md. 695, 717, 415 A.2d 830 (1980). This standard of review, while affording considerable deference to a jury's verdict, necessitates our focusing upon whether a rational jury could have found, based on the evidence presented, that Ricky's actions satisfied the elements which the General Assembly intended to constitute the crime of being a drug kingpin.

█ As we have stated so often before, "in the event that ambiguity clouds the precise application of [a] statute, the cardinal rule of statutory construction is to ascertain and effectuate legislative intent." *State v. Bricker,* 321 Md. 86, 92, 581 A.2d 9 (1990). *See also Taxiera v. Malkus,* 320 Md. 471, 480, 578 A.2d 761 (1990); *Harford County v. University,* 318 Md. 525, 529, 569 A.2d 649 (1990); *Jones v. State,* 311 Md. 398, 405, 535 A.2d 471 (1988). "The language of the statute itself is the primary source of this intent; and the words used are to be given 'their ordinary and popularly understood meaning, absent a manifest contrary legislative intention.'" *Privette v. State,* 320 Md. 738, 744, 580 A.2d 188, (1990), *quoting In re Arnold M.,* 298 Md. 515, 520, 471 A.2d 313 (1984). *See also State v. In re Patrick A.,* 312 Md. 482, 487, 540 A.2d 810 (1988); *Tucker v. Firemen's Fund Insur. Co.,* 308 Md. 69, 73, 517 A.2d 730 (1986).

█ In looking to the language of a statute, moreover, we read the words "in light of the full context in which they appear, and in light of external manifestations of intent or general purpose available through other evidence." *Cunningham v. State,* 318 Md. 182, 185, 567 A.2d 126 (1989). We attempt to divine legislative intent from the

entire statutory scheme, as opposed to scrutinizing parts of a statute in isolation. *Forbes v. Harleysville Mutual,* 322 Md. 689, 697, 589 A.2d 944 (1991); *Jones, supra,* 311 Md. at 405, 535 A.2d 471. We may also consider "a bill's title and function paragraphs ... and other material that fairly bears on the fundamental issue of the legislative purpose or goal...." *Kaczorowski v. City of Baltimore,* 309 Md. 505, 515, 525 A.2d 628 (1987); *see also Wynn v. State,* 313 Md. 533, 539, 546 A.2d 465 (1988).

The operative words of the drug kingpin statute, arguably applicable in Ricky's case, are as follows: " 'drug kingpin' means a person who occupies a position of an organizer, supervisor, financier, or manager as a coconspirator in a conspiracy to ... distribute ... in the State controlled dangerous substances." The words "organizer," "supervisor," "financier," and "manager," as we have already explained, have common meanings which require no elaboration. Undeniably, however, some ambiguity creeps into the statutory terms at the margins; thus, to determine just how broadly they are to be construed, we look to the larger context of the statute and to other relevant materials to ascertain legislative intent.

The operative terms "organizer, supervisor, financier, or manager" define the concept of the "drug kingpin." Indeed, the 1989 amendments to § 286 were entitled by the legislature as the "Drug Kingpin Act." Because the "Drug Kingpin" heading is the statute's focus of definition and elaboration, it is, of itself, pregnant with meaning. In bowling, the "kingpin" is the lead or front pin. The metaphor of the "drug kingpin" is therefore commonly understood to indicate one who fronts a drug trafficking network or conspiracy. The original version of the statute, as proposed, although later amended before its enactment, shared this understanding, for the "drug kingpin" label evolved from the blander statutory formulation of "a leader of a drug trafficking network." *See* Bill Analysis, Senate Bill 400, Senate Judicial Proceedings Committee. Another legislative source refers to "a leader or a kingpin of a drug

trafficking network." Governor's Office, *Briefing Document and Synopsis of the Drug Kingpin Act, Senate Bill 400/House Bill 502,* 1989, 5 (emphasis added). Still another describes a "drug kingpin" as a "large-scale drug trafficker." Department of Legislative Reference, *Legislative Session Review,* 1989, 66–67.

 It is plain to us that the phrase "drug kingpin" was intended by the legislature to apply to a leader of a drug trafficking network. It thus follows that the words "organizer," "supervisor," "financier," and "manager," read in the context of the statute, were not intended to encompass a person occupying a role substantially less than that of a large-scale drug trafficker. In other words, in looking to the larger context of the statute (which prescribes lesser penalties for non-kingpins); at the bill's title; and at external evidence in order to chart the blurry perimeters of the statute's operative terms, we believe that the legislature intended the statute's heightened penalties for "drug kingpins," or leaders, to have limited application to those acting as organizers, supervisors, financiers, or managers of large-scale drug trafficking operations. We glean this construction from an attempt to harmonize the drug kingpin provisions with the statutory scheme as a whole. *Forbes, supra,* 322 Md. at 697, 589 A.2d 944; *Scott v. State,* 297 Md. 235, 245, 465 A.2d 1126 (1983) ("[A] statute should be construed so that all of its parts are given effect and harmonized if possible....").

## A.

In affirming Ricky's conviction of being a drug kingpin, the Court of Special Appeals noted his argument that his only involvement in the drug conspiracy was to transport the cocaine from New York to Salisbury and that this was legally insufficient evidence to permit the jury to consider the drug kingpin count that he conspired with Gary to distribute the illegal drugs. The intermediate appellate court noted Ricky's further argument that he was not

involved in the conspiracy until a month after it began; that his brother Gary was the kingpin and the target of the police investigation; and that his participation was limited to the role of a courier.

The Court of Special Appeals first observed that Ricky was mistaken in believing that he could not be convicted as a kingpin if his role was subordinate to that of another actor in the conspiracy. The court said that nothing in the statute "dictates that a conspiracy can have only one kingpin." 89 Md.App. at 700, 599 A.2d 848. In this regard, the court noted that the statutory language encompassed "the possibility of a joint endeavor: among the definition section's meanings is a 'manager as a *coconspirator.'*" *Id.* (emphasis in original). The intermediate appellate court concluded as follows:

"The evidence amply supports the idea that Ricky acted in concert with Gary as a coconspirator. Jackson and Toatley gave the purchase money directly to Ricky; Ricky counted it; Ricky told Jackson and Toatley that they could deal directly with him; Ricky took the money and hid it in the car in which he transported the drugs. Gary's assertions also support the conclusion that Ricky was his coconspirator and an important participant in the conspiracy: Ricky set the sale price; Gary told Jackson and Toatley that he (Gary) was the intermediary in arranging an exchange between them and Ricky, and that he did not control the deal. Moreover, as an expert witness in narcotics enforcement, Jackson testified that mules have no control over the drugs they carry, and are paid $500 to transport drugs from New York. Because Ricky had complete dominion and control over the $34,000 paid to him for the drugs, Jackson concluded that Ricky was not merely a mule. Jackson also testified that Gary told him that Gary wasn't profiting from this transaction: '[h]e just made the arrangements for me to purchase the kilo of cocaine from or through his brother.'

"In sum, the evidence readily supports the theory that Ricky managed or supervised an illicit drug operation.

This operation could have been orchestrated by Gary's organization and limited to arranging to bring the cocaine from New York to Maryland. Alternatively, it could be inferred that Ricky was Gary's New York connection, prepared to assist in the transfer Gary initially proposed to Jackson in which Toatley and Sincere would travel to New York to pick up the drugs. In either case, the jury reasonably could conclude that Ricky was responsible for an important and necessary phase of the operation: moving the cocaine from New York and delivering it to its Maryland purchaser. We therefore affirm Ricky's conviction under the drug kingpin statute."

*Id.* at 700–01, 599 A.2d 848.

### B.

At argument before us, the State espoused the view that the statute should apply to anyone whom the words "organizer, supervisor, financier, or manager" can possibly be construed to reach, *i.e.*, not merely to "drug kingpins" but to any "non-menial drug conspirator." This construction, we think, is plainly at odds with the legislatively intended reach of the statute. We must read the words "organizer," "supervisor," "financier," and "manager" in light of the independent connotations of the word "kingpin." To do otherwise would be to impermissibly render surplusage the crucial words "Drug Kingpin," by which the statute is entitled, as well as the concept the disputed words purport to modify. *See Scott, supra,* 297 Md. at 245–46, 465 A.2d 1126.

We thus must consider whether Ricky's actions, viewing the evidence in the light most favorable to the State, amount to participation as an organizer, supervisor, financier, or manager in the drug conspiracy with Gary in the sense contemplated by the legislature. Before Ricky involved himself in the conspiracy underlying his drug kingpin conviction, the State Police had been targeting Gary, Ricky's brother, for over a month. Gary had told Jackson that he was the head of the drug distribution organization

and that he employed others in the organization. He had spoken or met with State Trooper Jackson no fewer than ten times before Jackson heard of Ricky. Gary and Jackson had arranged and completed two independent drug deals, without Ricky's participation, and had agreed upon terms of a third. Without first consulting Ricky, Gary volunteered Ricky's services to transport the drugs to Salisbury from New York as to which Ricky agreed by return phone call. Ricky's role then consisted, in its entirety, of the following: (1), agreeing to and transporting the drugs for Gary and Jackson's third deal to Salisbury; (2) negotiating the final purchase price of $34,000; (3) engaging a driver to transport him and the drugs to Salisbury; (4) receiving and counting Jackson's money; (5) secreting that money in his car; and (6) advising Jackson that he could be directly contacted for further sales.

On the record before us, we think the trial court erred in submitting the case to the jury on the drug kingpin count. The evidence showed that Ricky was more than a "mule" or mere courier of the drugs from New York to Salisbury. While he was an important cog in effectuating the third cocaine sale which Gary had arranged with Jackson, the evidence simply does not permit a rational factfinder to conclude, beyond a reasonable doubt, that Ricky's participation amounted to that of an organizer, a supervisor, or manager within the contemplation of the statute. On the contrary, the evidence showed that Gary, who was later convicted of being a drug kingpin, orchestrated the transaction in the course of which he offered Ricky's assistance to transport the drugs even before he had consulted with Ricky. According to the direct evidence, Ricky's involvement was limited to approximately six hours in which he obtained the drugs in New York and had them driven to Salisbury where he completed the sale and accepted the money. That Ricky may have, in Gary's presence, negotiated the final purchase price and accepted the money does not, without more, elevate his status to that of an "organizer," "supervisor," or "manager" in the conspiracy. It was

Gary, not Ricky, who the evidence showed arranged the third sale, as well as the earlier sales. That Gary, not Ricky, was the sole "kingpin" in the criminal episode is supported by the evidence that Gary instructed Ricky to "chill out" when Ricky tried to extract a larger final purchase price. As we see it, the jury could not, beyond a reasonable doubt, rationally infer from the direct evidence that because Ricky may have acted as Gary's source, and procured Walker to drive him to Salisbury, that he was a coconspirator in a conspiracy to distribute drugs, either as an organizer, supervisor, or manager. Nor did the evidence that Ricky told Jackson that Jackson could deal directly with him, and that Gary told Jackson that he was not profiting from the third sale, permit the jury to draw a rational inference that Ricky was a "drug kingpin" under the statute.

As a convicted criminal conspirator, drug courier, drug possessor, and drug dealer, Ricky was lawfully sentenced to thirty years in prison. His conviction for being a "drug kingpin," however, was improper and must be reversed.

JUDGMENT OF THE COURT OF SPECIAL APPEALS AS TO COUNT 1 OF THE INDICTMENT REVERSED; CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REMAND THE CASE TO THE CIRCUIT COURT FOR WICOMICO COUNTY WITH DIRECTIONS TO VACATE THE PETITIONER'S CONVICTION FOR BEING A "DRUG KINGPIN" UNDER COUNT 1 OF THE INDICTMENT. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY WICOMICO COUNTY.