619 A.2d 111

**Stacy Eugene DAWSON**

v.

**STATE of Maryland.**

**No. 49, Sept. Term, 1992.**

Court of Appeals of Maryland.

Feb. 8, 1993.

276

278

Claudia A. Cortese, Asst. Public Defender (Stephen E. Harris, Public Defender, both on brief), Baltimore, for appellant.

Mary Ellen Barbera, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., both on brief), Baltimore, for appellee.

MacKenzie Canter III of Lehrfeld, Canter, Henzki & Diskin of Washington, DC, for Chiefs of Police National Drug Task Force, amicus curiae.

Argued before MURPHY, C.J., and RODOWSKY, McAULIFFE, CHASANOW, KARWACKI and ROBERT M. BELL, JJ.

CHASANOW, Judge.

On June 7, 1991, the defendant Stacey Eugene Dawson received a trial by jury and was convicted of distributing the controlled dangerous substance cocaine within 1,000 feet of school property under Maryland Code (1957, 1992 Repl.Vol.), Article 27, § 286D.[1] We granted certiorari to decide the issue of whether § 286D, which criminalizes the distribution of a controlled dangerous substance within 1,000 feet of school property, even though the school was not in session at the time, violates due process requirements under the United States Constitution and the Maryland

---

1. Hereinafter all statutory references are to Maryland Code (1957, 1992 Repl.Vol.), Article 27, unless otherwise indicated.

Declaration of Rights. We hold that § 286D does not offend due process and affirm Dawson's conviction.

## I.

At approximately 9:30 p.m. on September 6, 1990, Corporal Taylor, Sergeant French, and Deputy Galbreath of the Harford County Sheriff's Department were conducting an undercover drug operation near the Aberdeen Proving Grounds in Harford County. The three deputies were driving on East Belair Avenue in an attempt to make undercover drug purchases. Upon entering the Church Green area of Aberdeen, the deputies saw a group of people gathered near a four foot high wall which paralleled the street. As the deputies passed the group, a young man sitting on the wall waved to the car and motioned for them to return. Corporal Taylor made a U-turn and stopped the car across the street from where the young man sat.

The young man climbed down from the wall, crossed the street, and approached the passenger side of the vehicle. When the young man asked what the undercover deputies were looking for, Corporal Taylor responded that they were looking for "coke." After a brief discussion, Corporal Taylor agreed to purchase a quarter-gram of cocaine. The young man produced a Newport cigarette pack from his pants pocket, removed a small clear plastic packet of cocaine from the cigarette pack, and handed the cocaine to Corporal Taylor through the passenger window. In return, Taylor handed the young man $25.00. In an attempt to learn the seller's name, Corporal Taylor asked whom to ask for if he wanted more cocaine. The young man refused to give his name but responded that "he was always sitting on the wall, and if [they] wanted Cocaine again, [they should] come back and look for him." The young man then returned to his perch on the wall, and the three deputies drove away. The transaction lasted approximately sixty seconds and occurred within 1,000 feet from Halls Cross Elementary School.

Upon leaving the scene, the undercover deputies radioed the Aberdeen Police Department to have a uniformed officer meet them. Within minutes, Officer Osborn met the three undercover deputies. Corporal Taylor gave Officer Osborn a description of the seller and the location of the sale. Corporal Taylor then instructed Officer Osborn to return to the sale area and ascertain the seller's name and address.

Moments later, Officer Osborn and another officer went to the sale area. Most of the group congregated near the wall dispersed upon seeing the police approaching. Two young men remained, however, one sitting on and one standing near the wall. Officer Osborn noted that the man sitting on the wall matched the description of the drug seller and asked him for identification. The man identified himself as Stacey Eugene Dawson. A short distance from where Dawson was sitting the officers found a pack of Newport cigarettes, which upon inspection was found to contain several small packages of cocaine.

The Grand Jury for Harford County indicted Dawson for unlawful distribution of a controlled dangerous substance, § 286(a)(1), and for unlawful distribution of a controlled dangerous substance within 1,000 feet of school property. § 286D. On June 7, 1991, Dawson received a trial by jury before the Circuit Court for Harford County, the Honorable Stephen M. Waldron presiding. After hearing the evidence, the jury found Dawson guilty on both counts. Dawson appealed to the Court of Special Appeals, and we granted certiorari before the intermediate appellate court had an opportunity to hear the case.

## II.

Dawson asserts two grounds upon which his conviction should be reversed. First, Dawson alleges that the evidence the State presented to the jury was insufficient to support his convictions. Next, he argues that § 286D violates the due process requirements of the United States

Constitution and the Maryland Declaration of Rights. We will review each contention and affirm Dawson's conviction.

### A.

Dawson first asserts that the evidence presented to the jury was insufficient to prove that he was the person who sold cocaine to the undercover officers. In reviewing the record to determine the sufficiency of evidence supporting a criminal conviction we are mindful of the respective roles of the court and the jury; it is the jury's task, not the court's, to measure the weight of evidence and to judge the credibility of witnesses. *McMillian v. State,* 325 Md. 272, 290, 600 A.2d 430, 439 (1992); *Hammond v. State,* 322 Md. 451, 463, 588 A.2d 345, 351 (1991). Where the sufficiency of the evidence underlying a criminal conviction is at issue, we must determine " 'whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt.' " *McMillian,* 325 Md. at 289, 600 A.2d at 438 (quoting *Jackson v. Virginia,* 443 U.S. 307, 318, 99 S.Ct. 2781, 2788–89, 61 L.Ed.2d 560, 573 (1979)). In order to preserve the jury's role in the truth finding process, the appropriate inquiry in applying this standard

> "does not require a court to 'ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.' ... Instead, the standard to apply is 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original).

*Tichnell v. State,* 287 Md. 695, 717, 415 A.2d 830, 842 (1980) (quoting *Jackson v. Virginia,* 443 U.S. 307, 318–19, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573 (1979)); *Johnson v. State,* 303 Md. 487, 510–11, 495 A.2d 1, 13 (1985), *cert. denied,* 474 U.S. 1093, 106 S.Ct. 868, 88 L.Ed.2d 907 (1986).

Dawson argues that "the evidence was not sufficient to support his distribution convictions, [since] there was no credible evidence that he—and not someone else—distributed [the] cocaine at issue." Dawson asserts that the evi-

dence linking him to the cocaine sale was "inherently suspect and virtually unbelievable." Dawson attempts to sow seeds of doubt regarding the State's testimonial evidence relating to the seller's identity. Specifically, he points to the poor lighting where the sale occurred, the brief period of time the purchasing officers saw the seller, the length of time between the purchase and the in-court identification, the fact that the seller wore a hat during the transaction, and the presence of twelve to fifteen other people, who left as Officer Osborn approached.

Dawson wishes for us to ignore the testimony of Corporal Taylor, Sergeant French, and Officer Osborn, and replace the jury's judgment with our own. At the trial, both Taylor and French identified Dawson as the person who waved for them to stop, approached the car's passenger-side window, and negotiated and sold cocaine to them. Both testified that they clearly saw Dawson's face while the transaction transpired within arm's reach. Finally Officer Osborn testified that after receiving the description of the seller, he immediately went to the area of the sale and found Dawson sitting on the wall. Officer Osborn testified that Dawson met the provided description and was sitting exactly where Deputy Taylor told him to look. In addition, Dawson himself admitted that he was at the scene of the drug sale. We conclude, when viewing the evidence in a light most favorable to the State, that there was sufficient evidence for a rational jury to find that Dawson was the person who sold Taylor the cocaine.

### B.

Dawson next challenges the constitutionality of § 286D under the due process clauses of both the United States Constitution and the Maryland Declaration of Rights. Dawson does not dispute that the State has a valid interest in protecting children from the ravages of the drug trade. Rather, he contends that there is no real and substantial relationship between the General Assembly's objective of protecting schoolchildren and § 286D's imposition of crimi-

nal liability without regard to the actual presence of children. He reasons that the "distinct [legislative] purpose of protecting school children ... clearly is not served by providing additional punishment for distribution at a time when there is or will be no school children in the area to be in any way exposed to the drug nemesis." We disagree.

We begin with the recognition that the General Assembly has broad authority, under the exercise of the State's police power, to criminalize certain conduct and to decide what penalties to impose for the commission of crimes. *Rice v. State*, 311 Md. 116, 126, 532 A.2d 1357, 1362 (1987); *Greenwald v. State*, 221 Md. 235, 240, 155 A.2d 894, 897 (1959), *appeal dismissed*, 363 U.S. 719, 80 S.Ct. 1596, 4 L.Ed.2d 1521 (1960). The General Assembly's exercise of this power is not limitless, but must be exercised within the confines of the United States and Maryland Constitutions. *Greenwald*, 221 Md. at 240, 155 A.2d at 897; W. LaFave & A. Scott, *Substantive Criminal Law* § 2.10, at 194–97 (1986).

Dawson makes what has been called a "direct" substantive due process challenge, alleging that there is a violation of due process because the law is not reasonably related to the public welfare. *See* W. LaFave & A. Scott, *Substantive Criminal Law* § 2.14(a), at 236 n. 2. As he correctly acknowledges, when such a challenge is made, the particular exercise of the police power will be upheld if the statute "bears a real and substantial relation to the public health, morals, safety, and welfare of the citizens of this state." *Bowie Inn, Inc. v. City of Bowie*, 274 Md. 230, 236, 335 A.2d 679, 683 (1975). As we have previously said:

"The exercise by the Legislature of the police power will not be interfered with unless it is shown to be exercised arbitrarily, oppressively or unreasonably. The wisdom or expediency of a law adopted in the exercise of the police power of a state is not subject to judicial review, and the law will not be held void if there are any considerations relating to the public welfare by which it can be sup-

ported. Such a statute carries with it a strong presumption of constitutionality." (Citations omitted).

*Id.; see also Montgomery County v. Fields Road Corp.*, 282 Md. 575, 583, 386 A.2d 344, 348–49 (1978); *Edgewood Nursing Home v. Maxwell*, 282 Md. 422, 426, 384 A.2d 748, 751 (1978); *Davis v. State*, 183 Md. 385, 397–98, 37 A.2d 880, 887 (1944). We note that because a law adopted in the exercise of the police power is presumed constitutional, its challenger bears "the burden of affirmatively and clearly establishing its invalidity." *Salisbury Beauty Schools v. State Bd. of Cosmetologists*, 268 Md. 32, 48, 300 A.2d 367, 378 (1973).

Under the above-stated due process principles, we must examine both the statutory language and underlying statutory purpose to determine whether a sufficient rational relationship exists between the two. The language of § 286D is clear and provides, in part:

"(a) A person who manufactures, distributes, dispenses, or possesses with the intent to distribute a controlled dangerous substance in violation of § 286(a)(1) [2] of this subheading, or who conspires to commit any of these offenses, is guilty of a felony if the offense occurred:

(1) In, on, or within 1,000 feet of any real property owned by or leased to any elementary school, secondary school, or school board, and used for elementary or secondary education ... regardless of whether:

(i) School was in session at the time of the offense; or

(ii) The real property was being used for other purposes besides school purposes at the time of the offense."

Underlying § 286D is the General Assembly's desire to protect school-age children. Based on the legislative histo-

---

2. Section 286(a)(1) of Article 27 states:

"it is unlawful for any person ... [t]o manufacture, distribute, or dispense, or to possess a controlled dangerous substance in sufficient quantity to reasonably indicate under all circumstances an intent to manufacture, distribute, or dispense, a controlled dangerous substance;"

ry of § 286D and the New Jersey statute from which it was derived,[3] it is clear that the General Assembly sought to enact a preventative measure designed to assure the safety of schoolchildren. First, the General Assembly sought to halt the proliferation of drug use among school-age children. In doing so, it sought "to seal off drug dealers from their potential demand, in this case elementary and secondary school students [who] are the victims," and to create a drug-free zone around school property. Testimony of Sen. Young on S.B. 289; *see also* Senate Floor Report, S.B. 289, 1989 General Assembly of Maryland ("[T]he bill is intended to address the drug problem and to enhance the educational environment by creating a drug-free zone around school property....").

In addition, the General Assembly also sought to limit schoolchildren's exposure to the violent crime and demoralizing environment associated with the drug trade. Section 286D was thus an attempt to shield children from the direct and indirect effects of drug trading, including observing drug sales and the commission of violent crimes which may accompany drug trading. *See id.;* Testimony of Sen. Young on S.B. 289 ("The 'drug-free school zone['] seeks to establish not only the psychological mind set of a clean environment, but backs it up with the muscle needed to insure that environment."); *cf. State v. Brown,* 227 N.J.Super. 429, 547 A.2d 743, 747 (1988) (New Jersey "drug-free zone" statute was intended to protect children from both sale of drugs and indirect harm from exposure to an unsafe environment). To accomplish these two goals, the General Assembly sought to eliminate all drug dealing near school grounds on a 24–hour basis.

---

**3.** Section 286D was modeled after legislation enacted in New Jersey. *See* Bill Analysis, S.B. 289 (1989); N.J.Stat.Ann. § 2C:35–7 (West Supp.1992). The New Jersey statute itself was modeled on 21 U.S.C. § 845a, then the federal "school yard" statute. *State v. Ogar,* 229 N.J.Super. 459, 551 A.2d 1037, 1040 (1989); *State v. Brown,* 227 N.J.Super. 429, 547 A.2d 743, 746 (1988).

Dawson's argument presumes that both the times at which children are near school grounds and the times that illegal drug transactions occur are predictable. He reasons that the legislation is too broad since it applies to those times when school is closed and children are unlikely to be present. Accordingly, he concludes § 286D does not substantially further the State's objective of safeguarding children. This argument ignores both the characteristics of school grounds and drug marketplaces, as well as the prophylactic nature of § 286D. The hours that children frequent the areas surrounding school grounds are not limited to those in which the school is open for classroom instruction. School grounds serve as a location for a variety of school-sponsored extracurricular activities as well as community-sponsored sports and social activities involving children which may take place during evening and weekend hours.

The very nature of the drug trade could warrant a 24–hour prohibition of drug sales within the vicinity of school grounds. The General Assembly chose not just to regulate the business hours of drug marketplaces near school facilities, but to deter their establishment entirely. Once an area is known as a drug market, it may draw prospective drug purchasers or sellers throughout the course of the day. In addition, discarded drug packaging, paraphernalia, or litter from drug sales may remain in an area heavily trafficked by curious children. A reasonable way for the General Assembly to limit the potential exposure of children to such activities was to convince those engaged in the drug market that the risks associated with conducting business in school areas, regardless of the hour, greatly outweighed their potential profits. If the drug market was removed from the area surrounding school property, it could logically follow that the likelihood of children having exposure to drugs would also decrease.

■ Contrary to Dawson's contention, the constitutionality of applying § 286D is not undermined simply because no children were present or because the transaction oc-

curred at a time when school was closed. The General Assembly established the "drug-free zones" as a prophylactic device aimed at protecting children on or near school property. We find that the application of § 286D to all transactions within the 1,000 foot perimeter, regardless of the presence of children, is substantially related to this goal. Considering the likelihood that children may be present in areas surrounding school grounds and the dangerous and unpredictable nature of drug market areas, the General Assembly's establishment of a 24–hour "drug-free school zone" bore a rational relationship to the achievement of the State's legitimate goal of protecting children. The constraints of due process "do not require that the means chosen by [the legislature] to deal with a problem score a notable success in every application of the statute." *United States v. Agilar,* 779 F.2d 123, 125 (2d Cir.1985), *cert. denied,* 475 U.S. 1068, 106 S.Ct. 1385, 89 L.Ed.2d 609 (1986); *United States v. Thornton,* 901 F.2d 738, 741 (9th Cir.1990). As several federal courts have indicated when reviewing 21 U.S.C. § 845a, the federal counterpart of § 286D, the fact that the statute may apply to transactions where children are not present does not render the statute unconstitutional, since the statute is designed to "deter the seller and other illicit dealers from conducting their operations near school property in the future." [4] *See United States v. Nieves,* 608

---

**4.** Section 845a has since been recodified as 21 U.S.C. § 860 (Supp. 1992). Rather than create a new offense, it enhances the penalty for another offense under certain circumstances. Section 860(a) provides:

"Any person who violates section 841(a)(1) or section 856 of this title by distributing, possessing with intent to distribute, or manufacturing a controlled substance in or on, or within one thousand feet of, the real property comprising a public or private elementary, vocational, or secondary school or a public or private college, junior college, or university, or a playground, or within 100 feet of a public or private youth center, public swimming pool, or video arcade facility, is (except as provided in subsection (b) of this section) subject to (1) twice the maximum punishment authorized by section 841(b) of this title; and (2) at least twice any term of supervised release authorized by section 841(b) of this title for a first offense. A fine up to twice that authorized by section 841(b) of this title may

F.Supp. 1147, 1149–50 (S.D.N.Y.1985); *United States v. Dixon,* 619 F.Supp. 1399, 1400 (S.D.N.Y.1985); *United States v. Cunningham,* 615 F.Supp. 519, 520–21 (S.D.N.Y. 1985); *United States v. Agilar,* 612 F.Supp. 889, 890–91 (S.D.N.Y.), *aff'd,* 779 F.2d 123 (2d Cir.1985), *cert. denied,* 475 U.S. 1068, 106 S.Ct. 1385, 89 L.Ed.2d 609 (1986).

We realize that the potential scope of § 286D may be broad, but as the Fifth Circuit noted in *United States v. Crew,* 916 F.2d 980, 983 (5th Cir.1990), when discussing the federal counterpart of § 286D:

"The applicability of [the schoolyard statute] does not depend on the direct presence of school children during the offense. The schoolyard statute['s] goal of creating a drug free zone around our nation's schools could not be realized if the protection the statute affords school children ends when the final bell rings each day. The elementary and secondary schools are places where children congregate before and after school hours. Moreover, any drug related activity in the vicinity of a school increases the likelihood that drugs would become accessible to the children who attend the school."

We also note that our research has indicated that every court reviewing drug-free school zone statutes has found them to be constitutional. *See, e.g., United States v. Campbell,* 935 F.2d 39, 45 (4th Cir.), *cert. denied,* —— U.S.

---

be imposed in addition to any term of imprisonment authorized by this subsection. Except to the extent a greater minimum sentence is otherwise provided by section 841(b) of this title, a person shall be sentenced under this subsection to a term of imprisonment of not less than one year. The mandatory minimum sentencing provisions of this paragraph shall not apply to offenses involving 5 grams or less of marihuana."

Federal courts have interpreted the federal statute to apply to instances where children were not present, or unlikely to be present, at the time of the sale. *See, e.g., United States v. Jones,* 779 F.2d 121, 123 (2d Cir.1985), *cert. denied,* 475 U.S. 1031, 106 S.Ct. 1236, 89 L.Ed.2d 344 (1986) (conviction for selling drugs at night inside a bar and "numbers joint" at least 2½ blocks from elementary school upheld). The original draft of S.B. 289 closely paralleled 21 U.S.C. § 845a, but was later amended to create a separate offense.

——, 112 S.Ct. 348, 116 L.Ed.2d 287 (1991) (federal school zone statute upheld since it was "rationally related to a legitimate government interest—keeping drugs away from the nation's schools."); *United States v. Rowe*, 911 F.2d 50, 51–52 & n. 7 (8th Cir.1990) (noting that "[s]ales *to* schoolchildren directly are not the only type of drug sales which have a harmful impact on schoolchildren" and rejecting due process and equal protection challenges) (emphasis in original); *Thornton*, 901 F.2d at 740–41 (finding that "the congressional goal of reducing the availability and hence the use of drugs by school children is rationally achieved by increasing the penalties for those who sell drugs near schools" and statute is "a rational means of reducing the availability of drugs to school children"); *United States v. Cross*, 900 F.2d 66, 68–69 (6th Cir.1990) (federal statute does not violate due process or equal protection); *United States v. Holland*, 810 F.2d 1215, 1218–24 (D.C.Cir.), *cert. denied*, 481 U.S. 1057, 107 S.Ct. 2199, 95 L.Ed.2d 854 (1987) (rejecting both due process and equal protection challenges to federal statute); *Agilar*, 779 F.2d at 125–26 (finding "[i]t is surely rational to achieve [the statute's] goal by increasing penalties for those who sell drugs near schools" and rejecting due process and equal protection challenges); *Dixon*, 619 F.Supp. at 1400–01 (rejecting due process and equal protection challenges to federal statute); *Nieves*, 608 F.Supp. at 1149–51 (noting that "[i]t is difficult to imagine a more rational way of keeping drug traffickers out of areas where children are more likely to come into contact with them than to subject them to a risk of stiffer penalties for doing business near school property," and rejecting due process and equal protection arguments); *State v. Burch*, 545 So.2d 279, 284 (Fla.App.1989) (holding that Florida statute did not constitute an unreasonable exercise of the state's police power, and rejecting due process and equal protection challenges); *State v. Rodriguez*, 225 N.J.Super. 466, 542 A.2d 966, 969–70 (1988) (New Jersey statute does not violate due process or equal protection "since it reasonably relates to a legitimate legislative purpose and is not

arbitrary nor discriminatory"); *State v. Moore,* 782 P.2d 497, 502–04 (Utah 1989) (Utah statute does not violate due process or equal protection clauses); *Commonwealth v. Burns,* 240 Va. 171, 395 S.E.2d 456, 459 (1990) (there can be no serious question either of the legislature's authority to enact the Virginia schoolyard statute or that it was not rationally related to the Commonwealth's interest in protecting children regardless of their presence); *State v. Hermann,* 164 Wis.2d 269, 474 N.W.2d 906, 911–12, *review denied,* 477 N.W.2d 286 (1991) (Wisconsin statute, even when applied to drug transaction in private residence, was a rational means of deterring illegal drug transactions near schools and, thus, did not violate due process or equal protection guarantees).

Accordingly, we hold that § 286D does not violate due process and affirm Dawson's convictions under §§ 286 and 286D.

JUDGMENT OF THE CIRCUIT COURT FOR HARFORD COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.