664 A.2d 387

Isabel **VELEZ**

v.

**STATE of Maryland.**

**No. 1500, Sept. Term, 1994.**

Court of Special Appeals of Maryland.

Sept. 1, 1995.

**198**

Michael R. Braudes, Asst. Public Defender (Stephen E. Harris, Public Defender, on the brief), Baltimore, for appellant.

Annabelle L. Lisic, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, and Joseph I. Cassily, State's Atty. for Harford County, Bel Air, on the brief), for appellee.

Submitted before BLOOM, DAVIS and HOLLANDER, JJ.

HOLLANDER, Judge.

This case results from a family run drug-trafficking operation in Harford County, Maryland, where appellant, Isabel Velez, lived with some of her grown children and several other adults. Appellant was convicted by a jury in the Circuit Court for Harford County of multiple narcotics offenses. Specifically, appellant was convicted of four counts of conspiracy to distribute cocaine, one count of conspiracy to distribute cocaine in a school zone, one count of conspiracy to import 28 grams or more of cocaine into Maryland, and one count of drug kingpin conspiracy, pursuant to Md.Ann.Code, Art. 27 § 290 (1992). In addition, Velez was convicted of one count of keeping and maintaining a nuisance, in violation of Md.Ann. Code, Art. 27 § 286(a)(5) (1992), and possession of cocaine with intent to distribute, pursuant to Md.Ann.Code, Art. 27 § 286(a)(1) (1992).[1] She received a total sentence of twenty years without the possibility of parole.[2]

Appellant presents a pentad of questions for our review:

1. Hereinafter, all statutory citations are to Maryland Ann.Code, Art. 27 (1992), unless otherwise specified.

2. Appellant received the following sentences: a twenty year sentence without parole for the drug kingpin conspiracy conviction; a ten year concurrent sentence for conspiracy to distribute cocaine with Luis Velez, Rose Velez and Raphael Velez; a ten year concurrent sentence for conspiracy to distribute cocaine with Mary and Bobby Cornette; a

I. Was the evidence legally insufficient to support the convictions for a "drug-kingpin" conspiracy and conspiracy to distribute a controlled substance in a school zone?

II. Was appellant deprived of the right to counsel at a pretrial suppression hearing?

III. Did the trial court err in failing to fully apprise appellant of her right of self-representation, and to permit her to elect between self-representation and representation by counsel?

IV. Did the trial court impermissibly restrict the direct examination of defense witness Richard Delvalle?

V. Did the trial court err in imposing separate sentences upon the convictions of engaging in a conspiracy as a drug kingpin and conspiracy to distribute cocaine?

For the reasons we discuss below, we conclude that the evidence was insufficient to support the conviction for drug kingpin conspiracy. Accordingly, we shall reverse that conviction and vacate the sentence. As we perceive no other errors, we shall affirm the remaining convictions.

### FACTS

From February 27, 1989 through January 17, 1992, appellant was employed as a custodian at the William Paca Elementary School, located in Harford County in a drug-free school zone.[3] Between November 1991 and January 1992, a Harford

---

ten year suspended sentence for conspiracy to distribute cocaine with Eddie Goodfellow; a five year suspended sentence for conspiracy to distribute cocaine with an unidentified individual; a ten year suspended sentence for conspiracy to distribute cocaine in a school zone; a fifteen year suspended sentence for conspiracy to bring into the State of Maryland cocaine in excess of 28 grams; a five year suspended sentence for maintaining a common nuisance; and a ten year suspended sentence for possession of cocaine with intent to distribute.

**3.** According to § 286D, a person who manufactures, distributes, dispenses, or possesses with intent to distribute a controlled dangerous substance within 1,000 feet of any elementary school or secondary school is guilty of a felony.

County Joint Narcotics Task Force conducted a wiretap surveillance of appellant's residence.

Interception of telephone calls to and from appellant's home revealed numerous conversations concerning the acquisition and distribution of cocaine. In many of the conversations, the parties spoke in Spanish and used Spanish words for "cocaine" or "coke." When the conversations were in English, however, the participants did not use the word cocaine. Instead, the participants employed code words, such as, "tickets," "shots," "books," "tires," "pants," and "rims." [4] During various telephone conversations, appellant's adult children often stated that they would have to wait until appellant arrived before drugs could be sold or that they needed her approval before a drug buy could be consummated. In other intercepted conversations, the participants discussed drug meetings at particular places. Following these conversations, the police conducted surveillances of the locations mentioned and personally witnessed drug exchanges. On January 10, 1992, the police concluded the wiretap surveillance and raided appellant's home, from which they recovered two ounces of cocaine. Appellant was one of many people charged with narcotics violations.

At a pre-trial suppression hearing, sixteen defendants, including appellant, represented by fourteen attorneys, joined in a motion to suppress the evidence obtained from the electronic surveillance. Because of the large number of defendants, one defense attorney was appointed to conduct the examination of witnesses at the suppression hearing, on behalf of all the defendants. The other attorneys were, however, permitted to interpose additional questions. After the hearing, the judge denied the motion to suppress.

---

**4.** Detective John Galbraith, an officer who supervised the wiretaps, testified that "Cocaine distributors know police can get wiretaps so they disguise what they are talking about by changing the slang, changing how they identify their drugs." Another officer testified that drugs are often referred to as automobile parts, ice cream, different foods and tickets. He stated that "CDS is never brought out."

Although the motion to suppress involved many defendants, appellant was tried alone. At her trial, appellant denied knowledge of, or participation in, any drug-related activities.[5]

Additional facts will be provided below, where pertinent to our discussion of the issues presented.

## DISCUSSION

### I. Sufficiency of the evidence

#### A. Drug kingpin statute

Appellant argues that the evidence was insufficient to convict her as a "drug kingpin" because: (1) the evidence did not establish that she was an "organizer, supervisor, financier, or manager," as required by § 286(g), and (2) the evidence was insufficient to establish that she dealt in the statutorily requisite quantity of drugs. Although we conclude that the evidence was sufficient to find that Velez was an "organizer" or "supervisor," we agree with appellant that the evidence was insufficient regarding the requisite quantity of narcotics.

 The standard of review for the sufficiency of evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original); *Williams v. State*, 329 Md. 1, 15, 616 A.2d 1275 (1992). In an action tried before a jury, "it is the jury's task, not the court's, to measure the weight of evidence and to judge the credibility of witnesses." *Dawson v. State*, 329 Md. 275, 281, 619 A.2d 111 (1993). In performing this role, the jury has the power to decide which testimony to accept and which to reject. "In this regard, it may believe part of a particular witness's testimony, but disbelieve other parts of that witness's testimony." *Pugh v. State*, 103 Md.App. 624, 651, 654 A.2d 888 (1995); *see also, Muir v. State*, 64 Md.App. 648, 654, 498 A.2d 666 (1985), *aff'd,*

---

5. At trial, appellant testified in Spanish, with the aid of an interpreter.

308 Md. 208, 517 A.2d 1105 (1986). Moreover, "it is the exclusive function of the jury to draw reasonable inferences from proven facts." *McMillian v. State,* 325 Md. 272, 290, 600 A.2d 430 (1992).

Section 286(a)(1) makes it unlawful for any person "to manufacture, distribute, or dispense, or to possess a controlled dangerous substance in sufficient quantity to reasonably indicate under all circumstances an intent to manufacture, distribute, or dispense, a controlled dangerous substance." Section 286(g) defines "drug kingpin" as "a person who occupies a position of an organizer, supervisor, financier, or manager as a coconspirator in a conspiracy to manufacture, distribute, dispense, bring into, or transport in the State controlled dangerous substances." When an accused is involved with at least 448 grams (16 ounces) of cocaine [6], and is a drug kingpin as defined by the statute, then the accused is subject to a mandatory minimum sentence of not less than twenty years without the possibility of parole. § 286(g).

In *Williams v. State,* 329 Md. 1, 616 A.2d 1275, based on the defendant's minimal involvement in the drug operation, the Court found the evidence legally insufficient to confer drug kingpin status on the defendant, whose involvement was limited to approximately six hours in which he obtained drugs in New York and had them driven to Maryland, where he completed the drug sale and accepted the money. *Id.* at 20, 616 A.2d 1275. The Court said:

> It is plain to us that the phrase "drug kingpin" was intended by the legislature to apply to a leader of a drug trafficking network. It thus follows that the words "organizer," "supervisor," "financier," and "manager," read in the context of the statute, were not intended to encompass a person occupying a role substantially less than that of a large-scale drug trafficker. In other words, in looking to the larger

---

**6.** Section 286(g) provides in pertinent part: "A drug kingpin who conspires to manufacture, distribute, dispense, bring into, or transport, in the State [448 grams or more of cocaine or 448 grams or more of any mixture containing a detectable amount of cocaine] is guilty of a felony...."

context of the statute (which prescribes lesser penalties for non-kingpins); at the bill's title; and at external evidence in order to chart the blurry perimeters of the statute's operative terms, we believe that the legislature intended the statute's heightened penalties for "drug kingpins," or leaders, to have limited application to those acting as organizers, supervisors, financiers, or managers of large-scale drug trafficking operations.

*Id.* at 17, 616 A.2d 1275.

The Court explored the operative words of Maryland's drug-kingpin statute by reference to Webster's Third New International Dictionary (1981). It stated:

[A]n "organizer" is "one who organizes" (to "organize" is "to unify into a coordinated functioning whole; . . . to arrange by systematic planning and coordination of individual effort"). A "supervisor" is "one that supervises a person, group, department, organization, or operation" ("supervise" is "to . . . oversee with the powers of direction and decision the implementation of one's own or another's intentions"). A "financier" is "a large scale investor." A "manager" is "one that manages, a person that conducts, directs, or supervises something."

*Id.* at 11, 616 A.2d 1275.

Here, appellant's conduct differs considerably, in kind and degree, from the conduct at issue in *Williams*. The State established at trial that appellant supervised and orchestrated many of the Velez family's drug transactions. Indeed, one officer testified, "Isabel is basically running the show." She helped determine who owed the family money for drugs, and she directed others to collect the money owed; her approval was sought before drug sales were made; she made the arrangements to purchase cocaine from their New York supplier; and she distributed drugs obtained in New York to lower-level players. Based on the evidence adduced at trial, a rational fact-finder could have found that Velez's role was that of an organizer, supervisor, or manager of the drug operation, not just a low-level player with no more authority than the others.

■ There was, however, insufficient evidence to establish that Velez dealt with at least 448 grams (16 ounces)[7] of cocaine, the minimum quantity needed to sustain her felony conspiracy conviction as a drug kingpin under § 286(g)(2). For purposes of determining the quantity of cocaine under the drug kingpin conspiracy section, the statute provides that the quantity of drugs may be aggregated if each aggregate act occurred within a 90 day period. Section 286(f)(2) states:

> For purposes of determining the quantity of a controlled dangerous substance under paragraph (1) of this subsection, the quantity of controlled dangerous substances involved in individual acts of manufacturing, distribution, dispensing, or possessing with intent to distribute *may be aggregated if each aggregate act of manufacturing, distribution, dispensing, or possessing with the intent to distribute occurred within a period of 90 days.*

Even when the evidence is viewed in a light most favorable to the prosecution, however, the State failed to establish the requisite amount of narcotics. The State proved the statutorily imposed quantity of drugs by aggregating the drugs Velez purchased and later sold. In essence, in establishing the quantity of drugs, the State failed to show that the drugs that were purchased were not the same drugs that were later sold. If they were the same drugs, the net result is that the State counted the same drugs twice.[8]

Our point is, perhaps, best illustrated by discussing what this case is not: it is not a case in which the State established that appellant negotiated to acquire 448 grams of cocaine; the State did not show that appellant bought 448 grams of cocaine; the State did not prove Velez possessed 448 grams of cocaine;

---

7. 448 grams equals approximately 16 ounces or one pound.

8. For example, if Velez bought two ounces of cocaine on Monday and sold two ounces on Tuesday, under the State's analysis, she had four ounces of cocaine. In actuality, it is at least as likely that on Tuesday Velez sold the same two ounces of cocaine that she acquired on Monday. Thus, the evidence on which the State relied to establish at least 448 grams of cocaine could actually have been just 224 grams.

nor did the State adduce evidence that Velez sold 448 grams of cocaine. In any of the foregoing circumstances, the State clearly would have established the requisite quantity of drugs.

Instead, in order to prove the requisite amount of drugs, the State established the following: Velez discussed selling one ounce of cocaine on November 25, 1991; during a telephone call on November 27, 1991, appellant discussed the purchase of four ounces of cocaine from someone in New York; Velez discussed the purchase of three ounces of cocaine from her former husband, who lived in New York, during a telephone conversation on December 10, 1991; she obtained and was present during the sale of a quarter ounce of cocaine on December 26, 1991; on December 27, 1991, Corporal Gus Economides spoke with Ricardo Delvalle, appellant's son, who indicated that he had six ounces of cocaine; the next day, Delvalle informed Economides that Economides could only purchase two "tires;" on January 5, 1992, Economides purchased two ounces at the Velez home, but appellant was not present during that purchase; on January 10, 1992, Economides purchased two ounces of cocaine from Delvalle; two ounces of cocaine were recovered from appellant's home during the drug raid on January 10, 1992.[9]

The foregoing summary illustrates that, at least to some extent, the State totalled the purchases and sales and added

---

9. In response to the motion for judgment of acquittal, the State argued:

11/27 there is a call from [appellant] to the unknown party in New York [for] four pants size 28. State contends that is a call for four ounces of cocaine being 28.

$$* \quad * \quad * \quad * \quad * \quad *$$

There is a call on 12/10/91 from [appellant] to what the State contends is Luis Velez, Senior in New York in which there is reference made to three pants size 28. So again the State contends that is three ounces of cocaine.

Looking at the sales related to Corporal Economides you have a sale on the fifth of January which he testifies to he received two ounces of cocaine.

that sum to the amount of drugs recovered during the search. Thus, based on the evidence presented by the State, a rational trier of fact could not have found, beyond a reasonable doubt, that the total amount of cocaine involved was at least sixteen ounces within a period of 90 days. *Cf. West v. State,* 312 Md. 197, 211, 539 A.2d 231 (1988) ("If the circumstances make one inference just as reasonable as the other, we must give the defendant the benefit of the conclusion that would mitigate his guilt." (Citation omitted)).

Here, the evidence that appellant purchased and sold quantities of cocaine could support one of two inferences: (a) that Velez sold the very same cocaine that she had just purchased; (b) that she sold cocaine other than that which she had just purchased. The first inference is as plausible as the second. Yet the first inference refutes the State's claim that Velez was involved with the requisite quantity of drugs sufficient to sustain the drug kingpin conviction. The kingpin conviction cannot stand if the State counted the same drugs twice in order to satisfy the statutory criteria as to quantity. Accordingly, we shall reverse appellant's drug kingpin conviction.

## B. Drug-free school zone

Appellant argues that the evidence was insufficient to sustain her conviction for conspiracy to distribute a controlled

---

You have a sale on the morning of the tenth in which he receives two ounces of cocaine, and you have two ounces being recovered from the house the morning of the warrant so that—

\* \* \* \* \* \*

And there is a quarter ounce on the 26th.

There is conversation on 12/27 between Corporal Economides and Richard Delvalle in which reference is made to six tires. Again the State's contention is that is six ounces, and if you factor in the later conversation he says he is down to four, so that means he had at least two grams that have been sold there.

\* \* \* \* \* \*

The later conversation is on 1/3/91 [sic]. So that [sic] State would indicate that was six.

Then he comes back there is only four, and somewhere two ounces have disappeared from the six, down to four. So there would be two additional ounces....

dangerous substance within 1,000 feet of a school zone, in violation of § 286D. She also argues that her conviction must be vacated because the scope of § 286D does not include *conspiracy* in a school zone. Rather, appellant contends that, in order to prove a violation of § 286D, the evidence must show that she did *manufacture, distribute, dispense, or possess with the intent to distribute drugs* while in a school zone. We disagree with Velez's argument.

Section 286D states, in pertinent part:

(a) A person who manufactures, distributes, dispenses, or possesses with intent to distribute a controlled dangerous substance in violation of section 286(a)(1) of this subheading, *or who conspires to commit any of these offenses,* is guilty of a felony *if the offense occurred:*

(1) In, on, or within 1,000 feet of ... any elementary school....

(Emphasis added.)

Appellant argues that the words "if the offense occurred" modify and apply only to the preceding four criminal goals set forth in the statute, i.e., "manufactures, distributes, dispenses, or possesses with intent to distribute." Under appellant's interpretation of § 286D, commission in the school zone of an act in furtherance of the conspiracy is not enough to sustain a conviction. Rather, she claims that the *object* of the conspiracy must be achieved in the school zone in order to sustain the conviction for violation of § 286D.

 The guiding principle of statutory construction requires that we ascertain and effectuate the legislative intent. *See Mustafa v. State,* 323 Md. 65, 73, 591 A.2d 481 (1991); *Jones v. State,* 311 Md. 398, 405, 535 A.2d 471 (1988); *Hawkins v. State,* 302 Md. 143, 147, 486 A.2d 179 (1985). When called upon to construe a particular statute, we begin our analysis with the statutory language itself, as the words of the statute, given their ordinary and popularly understood meaning, are the primary source of legislative intent. *See Dickerson v. State,* 324 Md. 163, 170–71, 596 A.2d 648 (1991); *State v. Bricker,* 321 Md. 86, 92, 581 A.2d 9 (1990); *Jones v. State,* 304

Md. 216, 220–21, 498 A.2d 622 (1985). If the language of the statute is plain and clear and expresses a meaning consistent with the statute's apparent purpose, further analysis is not ordinarily required. *See Kaczorowski v. City of Baltimore,* 309 Md. 505, 515, 525 A.2d 628 (1987); *Bricker,* 321 Md. at 92, 581 A.2d 9 (if language is consistent with purpose of statute, no further research is necessary); *Hawkins,* 302 Md. at 147, 486 A.2d 179.

On the other hand, if the statute is clouded with ambiguity, we must consider "not only the literal or usual meaning of the words, but their meaning and effect in light of the setting, the objectives and purpose of the enactment." *Tucker v. Fireman's Fund Insurance Company,* 308 Md. 69, 75, 517 A.2d 730 (1986); *see also Bricker,* 321 Md. at 93, 581 A.2d 9. "[W]e approach the analysis of the language from a commonsensical, rather than a technical, perspective, always seeking to avoid giving the statute a strained interpretation or one that reaches an absurd result." *Dickerson,* 324 Md. at 171, 596 A.2d 648. Moreover, the court's conclusions must be reasonable and logical. *Bricker,* 321 Md. at 92, 581 A.2d 9; *see also Jones,* 311 Md. at 405, 535 A.2d 471.

Assuming, *arguendo,* that the statute is ambiguous, we nonetheless conclude that appellant's narrow reading of the statute is contrary to its purpose and intent. Appellant's activities in *conspiring* on school property—without more—are within the ambit of § 286D. *See Kaczorowski,* 309 Md. at 515, 525 A.2d 628; *Bricker,* 321 Md. at 93, 581 A.2d 9.

The underlying purpose of § 286D is to protect school children from the nefarious effects of drugs and the drug trade. *Dawson,* 329 Md. at 284, 619 A.2d 111. The Legislature enacted the statute in an effort "to halt the proliferation of drug use among school-age children," and "to shield children from the direct and indirect effects of drug trading, including observing drug sales and the commission of violent crimes which may accompany drug trading." *Id.* at 285, 619 A.2d 111. Accordingly, the Legislature sought to abolish all effects of drug dealing near school property. Appellant has

not offered any authority to support her claim that *conspiracy* to violate the narcotics laws does not amount to drug dealing.

Section 286D was derived from a New Jersey statute, N.J.Stat.Ann. § 2C:35–7, which itself was modeled after the federal "school yard" statute, then 21 U.S.C. § 845a and now recodified at 21 U.S.C. § 860.[10] *Dawson,* 329 Md. at 285 n. 3, 619 A.2d 111. The construction of those statutes provides additional support for our view that a *conspiracy* on school property to manufacture, distribute, dispense, or possess a controlled dangerous substance—without more—is within the purview of the statute.

In *U.S. v. Rowe,* 911 F.2d 50 (8th Cir.1990), for example, the Court said: "Congress wisely sought to protect children from the evil influence of drug traffickers plying their nefarious trade in the immediate vicinity of schools, at such close proximity that they are visible from the school." *Id.* at 52. In *State v. Brown,* 227 N.J.Super. 429, 547 A.2d 743 (1988), the court explained:

> The legislature has made it clear that the purpose of the statute is not only to protect school children by shielding them from direct drug sales, but also to immunize them while they are within 1,000 feet of school property or a school bus from the *indirect* effects of drug dealings, such as observing drug sales, being exposed to the violence which frequently accompanies drug possession, having to contend with and frequently observe discarded drug paraphernalia, and suffering the fear and emotional harm which could arise from being in the vicinity of drug dealers, all of which create an unsafe environment for school children. In other words, the purpose of the legislature was to shield school children from the potential interference with their education from

---

**10.** In *Dawson,* the Court recognized the broad scope of § 286D. *Id.* at 288, 619 A.2d 111. Both the New Jersey statute and the federal statute are narrower in scope than the Maryland statute; neither the New Jersey statute nor the federal statute include as a crime the offense of "conspiracy" on school property to manufacture, distribute, dispense, or possess a controlled dangerous substance.

exposure to drugs that could arise from being in close proximity to the criminal drug milieu.

*Id.* 547 A.2d at 747.

Similarly, in enacting § 286D, the Maryland Legislature sought to eliminate all drug related influences from school property, including conspiracies to sell drugs. A contrary conclusion would permit those involved in the drug trade to avoid violation of the statute when they conspire in a school zone, so long as they achieve the object of the conspiracy outside of the school zone. Such a narrow construction of the statute would contravene its purpose and would not foster the type of drug-free environment in schools that the Legislature has attempted to create.

In this case, there was no evidence that appellant distributed or possessed drugs within 1,000 feet of William Paca Elementary School. The evidence, however, was sufficient to show that Velez committed acts in furtherance of the drug conspiracy while at school. As we have noted, the wiretap established that Velez made two drug related telephone calls from a pay telephone on school property. In one call to her house from the school's pay phone, Velez sought to determine if she had received any phone calls that day. She spoke with both her son, Raphael, and her daughter, Rose. They informed appellant that a regular buyer of cocaine had called and wanted to purchase more cocaine. Appellant responded that they did not have enough cocaine to sell to the buyer just then, but that they would be getting more cocaine. She also reminded Raphael and Rose that before they sold the buyer any more cocaine they were to collect from the buyer money that he owed them. Appellant placed the second phone call to her New York supplier. She told the supplier that her family intended to purchase cocaine from him, but that her drug couriers had run into problems in getting to New York.

In sum, there was sufficient evidence presented for a rational jury to conclude that appellant conspired to sell drugs while she was on school property. Moreover, that conduct falls within the ambit of the statute. Therefore, we hold that

appellant was lawfully convicted of conspiracy to distribute drugs within 1,000 feet of the William Paca Elementary School, in violation of § 286D.

## II. Right to counsel

Appellant argues that she was deprived of her right to counsel at the pretrial suppression hearing, when the court proceeded despite her attorney's unanticipated absence. We are of the view that, even if the court erred, its error was harmless. We explain.

As we noted, prior to trial, sixteen defendants joined in a motion to suppress the evidence obtained from the wiretap. Apparently because of the number of defendants involved and the commonality of the issues, one of the defense attorneys was appointed, without objection, to act as lead counsel at the hearing. The other defense attorneys were, of course, present and were permitted to participate.

Initially, a representative of the telephone company and a Maryland State trooper testified as to their involvement in installing the wiretap equipment. Prior to the testimony of the third witness, the prosecutor informed the court that appellant's counsel was not present. Another defense attorney advised the judge that Velez's counsel had left because he had another hearing in another court. The defense attorney also informed the court that he had agreed to take "copious notes" for Velez's attorney. The trial judge noted that Velez's counsel had not been excused. Rather, the judge said the attorney had been told to have his other case postponed. Nevertheless, the court proceeded with the testimony of the third witness.[11] After the witness completed his testimony, the judge said:

-----

11. The third witness was a sergeant with the Maryland State Police who had provided technical assistance during the wiretap. He testified that he physically hooked up the equipment to the telephone poles and verified with the telephone company that he had tapped the right phone lines. He stated that he did not assist in the monitoring of the wiretap in any way.

All right gentlemen we are going to postpone this case until 9:30 tomorrow morning. And the reason is the absence of the attorney for the Velezes, Mr. Janowich.

And also, I will warn you in addition to that, he was absent during the testimony of the last witness. We may have to recall that witness and let this fellow hear it, if he wants to cross examine. It will be up to him.

The next day, the trial judge asked appellant's counsel about his unexcused absence. Appellant's counsel explained to the trial judge that he had gone to attend another hearing under the mistaken belief that the trial judge had given him permission to do so. When the trial court asked appellant whether she was willing to continue the hearing with the same counsel, Ms. Velez answered: "If it doesn't happen again, because we need somebody." The trial court then told appellant: "[W]hat we are going to have to do, in fairness to you all, is go through again the last witness that testified on behalf of the State, who was Sergeant Schoyer. So we are going to have to go through his testimony again to give your attorney the opportunity, if he wishes, to cross examine the Sergeant." Appellant responded, "Yes, let's go ahead, sir." At that point, the State suggested that, because the witness was not available, a transcript should be prepared or appellant's counsel should make arrangements to review the court reporter's notes and then, if counsel wanted to cross examine the witness, the State would recall him. Appellant's counsel accepted that proposal. Later that day, at the end of the hearing, appellant's counsel told the judge that he had reviewed the testimony and did not have any additional questions for the witness.

Appellant argues that, as a result of what occurred during the suppression hearing, she was deprived of her right to counsel. She contends:

In the present case, an obviously bewildered defendant was deprived of counsel during a hearing concerning the admissibility of the strongest evidence against her. She was never consulted prior to counsel's disappearance, and never

acquiesced in it thereafter. The trial court's method of "curing" the error was to allow an attorney who was trying desperately to avoid a contempt hearing to placate the judge by declining an offer to reopen the testimony of a witness who had already completed his testimony—in other words, to prolong a hearing which he had already disrupted.

Therefore, we must determine whether, in allowing the witness to testify in the absence of appellant's attorney, any error was cured when the court invited counsel to review the testimony of the witness and then offered counsel the option of recalling the witness.

██ In the midst of an evidentiary hearing involving so many parties, coupled with the busy court docket, a judge would understandably be reluctant to halt the hearing in order to locate an attorney who unexpectedly absented himself or herself. Nevertheless, it would have been prudent for the court to suspend the proceedings until counsel was located. Indeed, the court apparently recognized the gravity of the situation when it decided to suspend the hearing for the day. Thereafter, the judge sought to cure any error when he discussed the matter fully with counsel and with appellant, offered counsel an opportunity to review the testimony of the witness, and permitted counsel to decide if he wanted to recall the witness. It is noteworthy that counsel declined to exercise the option to recall the witness and Velez agreed to proceed with the hearing. We are satisfied that, even if the court erred in proceeding without appellant's counsel, it cured the error; its error, if any, was harmless beyond a reasonable doubt.[12] *Cf. Brooks v. State,* 299 Md. 146, 156, 472 A.2d 981 (1984); *Dorsey v. State,* 276 Md. 638, 659, 350 A.2d 665 (1976).

---

**12.** The case of *Wooten–Bey v. State,* 76 Md.App. 603, 609, 547 A.2d 1086 (1988), *aff'd* 318 Md. 301, 568 A.2d 16 (1990), although discussing a situation in which appellant was denied an opportunity to consult with his attorney during a luncheon recess, is instructive here because it held that an error implicating the right to counsel can be deemed harmless. In *Wooten–Bey,* we declined "to impose a *per se* rule of reversal where the denial of access was brief, limited in scope, and where the trial judge gave counsel and appellant time to confer when it

We observe that neither the State nor the defense has referred us to any case that considers whether, under the circumstances present here, a defendant has been deprived of his or her constitutional right to counsel. To support her claim, appellant refers us only to cases involving Md.Rule 4–215.[13] In our view, however, Rule 4–215 is not implicated here; we are not confronted with a situation in which the court has denied a defendant the right to counsel, based on either an express waiver or waiver by inaction. In fact, appellant clearly exercised her right to counsel. While we are unable to find any Maryland case that is directly on point, several cases from other jurisdictions are helpful to our analysis.

We begin with the case of *United States v. Osterbrock*, 891 F.2d 1216 (6th Cir.1989), *cert. denied,* ── U.S. ──, 113 S.Ct. 1273, 122 L.Ed.2d 668 (1993). In that case, counsel was not present when the jury verdict was accepted, because he had been at lunch and then attended another legal proceeding in bankruptcy court. When the court could not locate counsel, it proceeded without him. The attorney later explained to the

_____

became apparent that they needed to do so, thus curing any constitutional defect." *Id.* at 609, 547 A.2d 1086. We concluded that "where the deprivation is short enough so that prejudice cannot be presumed and it is apparent that the proceeding was fundamentally fair, a *per se* rule of reversal and retrial will not be applied." *Id.* at 616, 547 A.2d 1086.

13. Rule 4–215 provides, in pertinent part:
 **(b) Express Waiver of Counsel.**—If a defendant who is not represented by counsel indicates a desire to waive counsel, the court may not accept the waiver until it determines, after an examination of the defendant on the record ... that the defendant is knowingly and voluntarily waiving the right to counsel....

 \* \* \*

 **(d) Waiver by Inaction—Circuit Court.**—If a defendant appears in circuit court without counsel on the date set for hearing or trial, indicates a desire to have counsel, and the record shows compliance with section (a) of this Rule ... the court shall permit the defendant to explain the appearance without counsel.... If the court finds that there is no meritorious reason for the defendant's appearance without counsel, the court may determine that the defendant has waived counsel by failing or refusing to obtain counsel and may proceed with the hearing or trial.

trial court that he had not anticipated that the jury would reach its verdict as quickly as it did. The Sixth Circuit determined that any error in proceeding without defense counsel was harmless beyond a reasonable doubt. The Court said:

> The sixth amendment guarantees the right to competent counsel to all individuals accused of crimes. The presence of the defendant's counsel "is essential because [he is] the means through which the ... rights of the person on trial are secured." "Where the sixth amendment claim is the denial, rather than the effective assistance of counsel, the criminal defendant need only show that counsel was absent during a *critical stage* of the proceedings in order to establish a constitutional violation."
>
> * * * * * *
>
> Since this court's decision in [*United States v.] Smith*, [411 F.2d 733 (6th Cir.1969),] the harmless error analysis, enunciated in *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) has been applied to sixth amendment violations resulting from defense counsel's absence during a critical stage of the trial.

*Id.* at 1218 (citations omitted). Based on the harmless error doctrine, the Court concluded that any prejudice suffered by defendant was "merely speculative," and the attorney's absence did not require reversal. *Id.*

The case of *Headen v. United States*, 373 A.2d 599 (D.C. 1977) is also instructive. In *Headen*, trial counsel was not present when the verdict was rendered and the jury was polled. Thereafter, appellant claimed that the attorney's absence deprived him of his constitutional right to counsel at a critical stage of his trial. The Court of Appeals for the District of Columbia disagreed. Although it acknowledged that the trial court erred in proceeding without appellant's counsel, the Court deemed the error harmless.

> We are of the opinion ... that this infringement of appellant's right to counsel is subject to the "harmless error" rule of *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17

L.Ed.2d 705 (1967).... In the instant case, the government has sustained its burden of proving harmless a constitutional error. That is, we are able to conclude beyond a reasonable doubt that the judgment of guilty accurately reflects the verdict of the jury and that the absence of counsel did not contribute to the judgment of conviction entered against appellant in this prosecution.

*Id.* at 601 (citations omitted).

Similarly, in *State v. Holmes,* 157 N.J.Super. 37, 384 A.2d 528 (1978), the Superior Court of New Jersey held that the absence of defense counsel from the courtroom for approximately 18 minutes while the court was instructing the jury did not entitle appellant to relief. The attorney had been permitted to read the portion of the charge that he had not heard and he had no objections to the court's instructions. Thus, the Court said:

> We agree that a defendant has a constitutional right to have counsel represent him at all stages of a criminal trial. But the court here did not exclude counsel. He failed to appear. We would have hoped that the judge would have inquired as to the cause of the delay before commencing the charge without awaiting the presence of the attorney. We are not told whether the attorney had previously been tardy.
>
> We have no doubt that there was no prejudicial infringement of defendant's right to counsel, for even "constitutional" errors may be harmless.

*Id.* 384 A.2d at 530 (citations omitted).

Applying the principles of the foregoing cases to this one, we conclude that any error in this case was harmless beyond a reasonable doubt. First, we are satisfied that "the absence of counsel did not contribute to the judgment of conviction...." *Headen,* 373 A.2d at 601. Second, during the brief period of time in issue, appellant's interests were adequately protected by the other defense attorneys, one of whom had been assigned to argue the motion to suppress on behalf of all sixteen defendants, and another of whom took "copious notes" for

Velez's attorney. Third, the court permitted Velez's attorney to review the testimony of the witness and then offered to recall the witness if defense counsel wanted the court to do so. After reviewing the notes, counsel declined the court's invitation. Fourth, counsel's absence was relatively brief, and he missed the testimony of only one witness, whose testimony was of a technical nature. In sum, under the circumstances present here, reversal is not warranted.

## III. Right to self-representation

Appellant argues that the trial court erred when it failed to apprise appellant of her right to self-representation and to permit her to elect between self-representation and representation by counsel. This argument is without merit.

Appellant never specifically asked to remove counsel and to represent herself. Rather, on the first day of trial, appellant's attorney, who was assigned to represent her through the Office of the Public Defender, moved to strike his appearance because of the difficulties he had in meeting with appellant to discuss her case. Appellant's attorney told the trial court that, when they met, appellant stated that she did not want him to represent her. The prosecution asserted that appellant had been told on numerous occasions that she had three alternatives regarding representation: she could either hire her own attorney, represent herself, or proceed with her present attorney. When the trial court asked appellant how she wanted to proceed, appellant responded, through an interpreter, "if [appellant's counsel] is going to help [appellant] he can stay as her lawyer, but [if] he is not going to help he can be removed, she could represent herself." At this point, the trial judge inquired into appellant's ability and desire to represent herself. The court asked questions regarding appellant's education, her employment, and her ability to represent herself.

After some discussion regarding appellant's ability to represent herself, the court stated:

THE COURT: But her answer is that if [her counsel] will try to help she wants [her counsel] through the Public Defender?

[APPELLANT]: That's correct.

The court then denied counsel's request for removal from the case, concluding that appellant had agreed to representation and, further, that she needed an attorney. The court said:

I understand [appellant's counsel's] request. I am going to deny it ... I simply cannot allow Ms. Velez to attempt to represent herself. I think that would be legal suicide for Ms. Velez.

As she seems to indicate, anyway, that [her attorney] can help, she needs some help anyway, although she then says she would give it a try with just an interpreter, but having a sewing machine operator speak fluent English, that would be legal suicide in a wire tap case such as this, but when you add the extra impediment that Ms. Velez has some knowledge of English, that apparently when she is upset she needs the interpreter has just even more an impediment, and so for those reasons the Court will deny [appellant's counsel's] request and he will continue the defense of Ms. Velez.

▮▮▮ It is well settled that "all defendants have a right to have effective assistance of counsel and to reject that assistance and defend themselves." *Brown v. State*, 103 Md.App. 740, 746, 654 A.2d 944 (1995). In *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), the Supreme Court reasoned that "forcing a lawyer upon an unwilling defendant is contrary to [her] basic right to defend [herself] if [she] truly wants to do so." *Id.* at 817, 95 S.Ct. at 2532.

In *Snead v. State*, 286 Md. 122, 406 A.2d 98 (1979), the Court of Appeals explained how a trial judge must proceed when a defendant expresses a desire to represent himself or herself. The Court held that, when a defendant indicates a desire to proceed *pro se*, the court must inquire whether he or she truly wants to do so; the court must ascertain whether the defendant "clearly and unequivocally" wants to defend himself

or herself. *Id.* at 127–128, 406 A.2d 98. "If a defendant makes known to the court, admitting of no doubt or misunderstanding, that he desires to represent himself, the right to do so has been properly asserted." *Id.* at 128, 406 A.2d 98. Thereafter, the defendant must be made aware of the "dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.'" *Id.* at 129, 406 A.2d 98 (quoting *Faretta,* 422 U.S. at 835, 95 S.Ct. at 2541); *see also State v. Renshaw,* 276 Md. 259, 267, 347 A.2d 219 (1975) (record must show defendant is competent to waive right to counsel and that defendant is aware of advantages and disadvantages of self-representation).

In this case, however, appellant never specifically said that she wanted to proceed *pro se.* Rather, her comments were in response to her attorney's request for removal as her counsel. Velez told the court she would represent herself if her lawyer was not going to help her. The trial court then inquired whether appellant truly desired to represent herself. When asked whether she wished to proceed without counsel, appellant responded that if her counsel would help, she would like his help, but if he would not, he could be removed.

We believe that Velez's response was not a "clear and unequivocal" assertion of the right to proceed *pro se.* On the contrary, it was an equivocal statement that she wished to proceed with counsel if her counsel was able to help. Believing that her counsel was able to help, and that having an attorney was in Velez's best interest, the trial court denied counsel's request to strike his appearance. We find no error merely because the court expressed its view that Velez needed an attorney and would benefit from having one.

## IV. Sustained objection

Appellant argues that the trial court erred when it sustained a particular objection by the State during the direct examination of defense witness Ricardo Delvalle ("Delvalle"), appel-

lant's grown son. During direct examination of Delvalle, the following exchange took place:

[DEFENSE COUNSEL]: Now during that period of time from November to January did you at any time observe your mother selling any drugs?

[PROSECUTOR]: Objection.

COURT: Hold on. Sustained.

Appellant argues that the answer to the question was relevant to her defense and that she suffered unfair prejudice when the prosecutor's objection to the question was sustained. We disagree.

Preliminarily, we note that "the scope of examination of witnesses at trial is a matter left largely to the discretion of the trial judge and no error will be recognized unless there is clear abuse of such discretion." *Oken v. State,* 327 Md. 628, 669, 612 A.2d 258 (1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1312, 122 L.Ed.2d 700 (1993). Nonetheless, assuming, *arguendo,* that the trial court erred in sustaining the objection, the error was harmless beyond a reasonable doubt. *Dorsey v. State,* 276 Md. at 659, 350 A.2d 665. This is so because "there is no reasonable possibility that the [exclusion of the] evidence . . . may have contributed to the rendition of the guilty verdict." *Id.* We explain.

At the time of Velez's trial, Delvalle had served two years and two months of a five-year sentence for selling seven ounces of cocaine. Delvalle admitted on direct examination that during the relevant time period he had a drug problem and had sold drugs to pay for his drug habit. After the exchange noted above, Delvalle testified on both direct and cross-examination that his mother did not know that he stored drugs at her home, he never discussed any drug sales with his mother, his mother had nothing to do with any drug sales, and that she did not know that he was selling drugs. Consequently, even though the trial court sustained the State's objection to the question of whether Delvalle ever observed his mother selling drugs, the answer to this question, and more, was

ultimately elicited after further examination at trial. Thus, we find no prejudicial error.

## V. Merger of convictions

Appellant claims that, for purposes of sentencing, five of her conspiracy convictions should have been merged with her drug kingpin conspiracy conviction. She contends that the State aggregated the various conspiracy charges in order to establish the drug kingpin conspiracy and that "each of the smaller conspiracies thus comprised necessary elements of the greater kingpin conspiracy." As we have reversed the drug kingpin conspiracy conviction, appellant's claim of error is moot.

**JUDGMENT OF CONVICTION FOR DRUG KINGPIN CONSPIRACY REVERSED AND SENTENCE VACATED.**

**JUDGMENTS OTHERWISE AFFIRMED.**

**COSTS TO BE PAID ONE HALF BY APPELLANT AND ONE HALF BY HARFORD COUNTY.**